[This opinion has been published in *Ohio Official Reports* at 88 Ohio St.3d 59.]

THE STATE OF OHIO, APPELLEE, *v*. ROBB, APPELLANT.

[Cite as *State v. Robb*, 2000-Ohio-275.]

*Criminal law—Aggravated murders—Death penalty upheld, when.*

(No. 98-1166—Submitted October 19, 1999—Decided March 1, 2000.)

APPEAL from the Court of Appeals for Franklin County, Nos. 95APA08-1003 and 95APA08-1008.

_____

{¶ 1} Around 3:00 p.m., on Easter Sunday, April 11, 1993, inmates at the Southern Ohio Correctional Facility ("SOCF") in Lucasville rioted and took control of L Section, one of three main areas in the prison. On April 15, inmates killed Robert Vallandingham, one of twelve correction officers taken hostage. On April 21, four hundred seven inmates surrendered and released the last five hostages. During the surrender process, inmate David Sommers was also killed. Defendant-appellant, Jason Robb, was found guilty as one of the inmates responsible for the murders of Vallandingham and Sommers.

{¶ 2} Before April 11, some Lucasville inmates had joined three prison gangs, the "Muslims," the Aryan Brotherhood ("Aryans"), and the Black Gangster Disciples ("BGD"). The largest gang in L Section consisted of approximately forty or fifty Muslims, who professed Islam. Prominent members included Carlos Sanders, also known as Hasan, Leroy Elmore, Stanley Cummings, James Were, and James Bell.

{¶ 3} The Aryans professed racial separatism and objected to inmates of different races being forced to share a cell. Defendant, along with Freddy Snyder, led some twenty to thirty Aryans in L Section, including George Skatzes, Jesse Bocook, and Roger Snodgrass.

{¶ 4} Anthony J. Lavelle, a principal prosecution witness, led the BGD, with ten or twelve members in L Section. Lacking a strong ideology, the BGD concentrated on gang activity such as selling protection and contraband, *e.g.*, alcohol.

{¶ 5} Sometime before April 11, the Muslims learned that prison officials planned mass tuberculosis testing, which involved an injection. Those TB tests conflicted with Muslim religious beliefs. The Muslims also learned that officials planned to lock inmates in their cells on April 12 to enforce TB testing. Before April 11, Muslim leaders met with Aryan and BGD leaders in efforts to resolve conflicts, avoid gang fights, and focus on a unified front against prison authorities. Muslims also told defendant about the planned riot before it happened.

{¶ 6} Around 3:00 p.m. on April 11, as about two hundred inmates returned from the recreation yard, inmates led by the Muslims attacked the thirteen guards then working in L complex. Within an hour, rioters had seized control of the L Section central corridor and eight adjacent cellblocks, L-1 through L-8, and freed all inmates, including defendant, from their locked cells.

{¶ 7} Rioting inmates also took twelve correction officers as hostages, although inmates released four seriously injured officers the first day. Corrections Officer Darrold Clark, Jr., had locked himself into a stairwell in L Section, but inmates broke through the wall. Officer Vallandingham had barricaded himself in a bathroom, but prisoners, including defendant, broke in the door. When inmates captured Vallandingham, they hit him several times. Defendant then intervened and directed inmates to take him hostage by saying, "[d]on't hurt the guy, we need him."

{¶ 8} After the officers, including Vallandingham and Clark, were taken as hostages, inmates handcuffed them, blindfolded them, and forced them into inmate clothing. Aryans held Vallandingham and others in L-1, and later turned

2

Vallandingham over to the Muslims, who mostly kept him and others in L-6, the Muslim stronghold. Guards were also held as hostages in other cellblocks.

{¶ 9} For several hours chaos prevailed throughout the corridor, cellblocks, and gym. Inmates armed themselves with weapons, hid their identity with masks, and tore up fixtures, furniture, and other property. Several reputed prison informants were murdered, and their bodies were later dragged outside to the recreation yard.

{¶ 10} Although the violence appeared random, gang leaders systematically directed, at least in part, the property destruction and assaults. For example, inmates blocked off building entrances with stacked-up furniture. Gang members opened cellblock doors and forced other inmates into the central corridor or the gym, which was at one end of the corridor. Gang leaders, including defendant, posted doormen at all exits so that inmates inside could not freely leave the building.

{¶ 11} Despite the inmate guards at the exits, defendant, as a gang leader, could freely enter or leave Section L, or take others through the checkpoint, as he wished. At times, defendant went to the outside recreation yard and urged Aryans to come inside L Section because they had food, water, and knives. In fact, over one hundred inmates remained in the prison yard, and officials were unable to return them to cells until around 1:30 a.m. the next morning.

{¶ 12} When defendant was inside L Section, he burned files, assigned jobs, forced inmates from their cells, and issued orders, including directions that dead bodies be taken out to the yard. Defendant also set up a planning room and tried to find inmates who had a military background. As inmate Robert Brookover testified, defendant was one of the leaders and had to be obeyed. If not, "I'd be locked up or either beat or killed."

{¶ 13} By late afternoon on April 11, prison officials talked on the telephone with gang members about the uprising as well as the condition of the

hostages. By April 12, these conversations were recorded ("negotiation tapes"). James Bell, a Muslim, initially served as the inmate spokesman. Then both Skatzes, an Aryan captain, and Lavelle, the BGD leader, along with Cummings, a Muslim, served as primary negotiators. Other inmates and correction officers also spoke on the telephone. By 3:00 p.m., April 15, defendant identified himself as an "inmate negotiator" and later apparently served as the principal negotiator.

{¶ 14} During the siege, the gangs staked out portions of the prison that each gang individually controlled. Hasan and the Muslims controlled cellblock L-6, and only Muslims and their sympathizers had access to that block except for defendant and Lavelle. At first, the Aryans stayed in the gym, but after about two days, they moved to L-2, which they thereafter controlled. The BGD members controlled and stayed in L-1. Other inmates stayed mostly in the gym or in the central corridor. During the uprising, each gang recruited additional members and sympathizers.

{¶ 15} Gang leaders also assigned inmates tasks such as collecting water from leaking pipes, collecting and safeguarding food, distributing food and water, guarding entrances to the building and some cell blocks, making weapons, and serving as "security" and bodyguards to keep peace and protect gang leaders. "Security" forces members wore striped referee shirts to identify themselves. During the siege, gang leaders, including defendant, ordered gang members to publicly beat up Bruce Harris, who had allegedly raped an inmate, and Franklin Francis, who tried to escape the building. These beatings were designed as an object lesson to prisoners to obey gang leaders.

{¶ 16} Members of all three gangs watched over the hostages, and Aryans helped watch over Vallandingham. Gang leaders also made sure that hostages were periodically moved and protected against violence. In negotiations, defendant told state officials, "I got people guarding some of your people myself * * * to keep them officers safe." The Muslims kept hostages in L-6 and L-4. After the second

4

day, the Aryans took custody of Officers Ratcliff and Clark and kept them in L-2. Sanders and defendant ordered inmates guarding every hostage to kill them if police forces rushed L complex.

{¶ 17} During the uprising, gang leaders, including Hasan, Cummings, defendant, Skatzes, and Lavelle, met regularly to resolve difficulties and to discuss their negotiating strategy with prison officials. Many gang leadership meetings as well as telephone negotiations occurred in L-2, the Aryan stronghold. Inmate Sommers, not a gang member, worked with the phones and tape recorders in L-2. Thus, Sommers overheard gang leadership meetings as well as Aryan discussions.

{¶ 18} Large utility tunnels ran underneath the central corridor as well as underneath cellblocks. During the uprising, prison officials controlled these tunnels and refused to evacuate their forces despite repeated inmate demands. On April 13, FBI technicians placed microphones in the tunnels and thereafter recorded inmate conversations occurring above the tunnels, including meetings of gang leaders (the "tunnel tapes").

{¶ 19} Around 8:00 a.m., April 12, state officials turned off the water and electricity in L Section, and gang leaders threatened to kill or harm hostages if these utilities were not turned back on. On April 13, Skatzes repeatedly threatened the lives of hostages, *e.g.*, "you just cost one his life," if state officials did not turn on the water and electricity. On a bullhorn, defendant told state officials, "we are gonna off this motherfucker" and, "if you don't turn lights and water back on, we are gonna kill a guard." Defendant also directed inmates to break out a window so that an officer could be publicly executed.

{¶ 20} By April 14, gang leaders were also upset over the lack of progress in negotiations and the lack of food. On April 14, media remarks from a Corrections Department spokesperson further upset gang leaders. Inmates began to believe that prison officials were not seriously concerned about threats to the hostages.

{¶ 21} At meetings on April 14 and early on April 15, gang leaders again discussed killing a guard. Kenneth Jenkins described defendant as campaigning to have a guard killed. Lavelle, David Lomache, and Snodgrass all testified that defendant agreed to the killing of a hostage in order to get negotiators to treat them seriously. Defendant told the other gang leaders that "this [is] the only way they gonna take us serious. * * * [A]s soon as I made * * * [that threat on April 13] that's when all that movement started happening."

{¶ 22} In the early morning April 15 meeting, gang leaders agreed to demand electricity and water and issued a strict timetable for compliance or they would kill a guard. At the end of the meeting, Cummings asked if everybody agreed that "if [they] don't give us these things, * * * then we gonna kill them one." Both Snodgrass and Lavelle verified that defendant voted for an officer to be killed if water and electricity were not turned on in the time demanded.

{¶ 23} Around 9:00 a.m., following the April 15 meeting, Skatzes told prison officials, "If you don't turn it [electricity and water] on, it's a guaranteed murder. * * * Do your thing. 10:30 or a dead man's out there." Jenkins recalls defendant saying after the meeting that "if they ain't gonna take us serious, we might as well send them out a guard." While walking to L-7, defendant said that "we'll just do it over here."

{¶ 24} That same morning, inmates from different gangs assembled to kill a guard, and defendant told them, "They think that we're bullshitting. * * * [W]e have to send one up out of here." However, Vallandingham was killed before that specific group acted.

{¶ 25} Around 11:10 a.m., on April 15, prison officials saw four hooded inmates carry Vallandingham's body into the prison yard. When masked inmates carried Vallandingham's body into the central corridor, defendant, Skatzes, Bocook, Snodgrass, and others followed behind in a kind of funeral procession.

6

**{¶ 26}** Inmate James Were reportedly later told another inmate that Vallandingham was strangled with a cord and a bat, stating that "when you * * * played the bat like a seesaw, that did the trick." An autopsy confirmed that Vallandingham was strangled with a ligature consistent with Were's description.

**{¶ 27}** On April 15, defendant told Officer Michael Hensley, another hostage, that "the state murdered the officer." When Hensley disagreed, defendant said, "[T]he state didn't take [them] serious, so they had to take a life." Further, defendant said that "if they didn't take them serious," then "they would take another one."

**{¶ 28}** By the late afternoon of April 15, prison officials agreed that an inmate could make a radio address discussing inmate demands. George Skatzes, who was selected by the gang leaders, made a radio address that evening from the recreation yard. During the broadcast, Skatzes also said, "We as a convict body send our condolences to Bobby's family. * * * But that is something that had to happen." In return for the broadcast, inmates released Clark. Before he was released, defendant came to Clark's cell and told him that "we've been talking and * * * we've decided to let one guard go and * * * it's gonna to be you."

**{¶ 29}** On April 16, officials and inmates agreed on a TV broadcast, and Cummings made a TV broadcast that emphasized Muslim concerns. In return, inmates released Officer Tony Demons. Prison officials also made three deliveries of food and water during the crisis. After inmates released Demons, they continued to hold five corrections officers as hostages until the surrender. Inmates presented at least eighteen demands for reforms, and the state agreed to many of these demands.

**{¶ 30}** By April 17, defendant injected himself directly into the telephone negotiations and presented new demands, and little progress was made for several days. Discussions concerned procedures for face-to-face negotiations, and defendant insisted that inmates be represented by legal counsel. Inmates declined

to release any hostages for the opportunity to consult counsel or for face-to-face negotiations. At one point, defendant discussed with inmate David Lomache his plan of cutting off a hostage's hands to force the state to take inmates seriously.

{¶ 31} Ultimately, state officials allowed Cleveland attorney Niki Schwartz to consult with inmates. Thereafter, three gang leaders, defendant, Hasan, and Lavelle, along with Schwartz, sat on one side of a prison fence and negotiated across the fence with officials from the FBI, the State Highway Patrol, and the prison. Negotiations succeeded, and four hundred seven inmates surrendered on April 21, over an eight-hour period.

{¶ 32} While the surrender was underway, the Aryans decided to kill inmate Sommers because he knew too much about what had happened in L-2, the Aryan stronghold. In fact, even earlier, defendant had talked with Hasan about killing Sommers or putting his eye out with a cigar. While defendant, Bocook, Skatzes, and a recent Aryan recruit, Robert Brookover, were together in L-7, they talked about killing different inmates. At one point, defendant left, returned, and announced, "We still got one." Bocook then said, "Go get the bitch David Sommers." Defendant left, then came back in running with Sommers running right behind him.

{¶ 33} When Sommers came in, Brookover stabbed and choked him, and Snodgrass, Bocook, Skatzes, and Brookover hit Sommers with ball bats. Defendant stood by and watched from a distance on a walkway. Then a Muslim and a BGD member came in, and one joined the attack on Sommers. Although Sommers was stabbed numerous times, he died from massive skull trauma, with the base of his skull completely shattered.

{¶ 34} After killing Sommers, Aryan members joined in the surrender process. In accordance with the surrender terms, prison officials immediately bused some one hundred twenty-nine inmates, who were selected by gang leaders, to other prisons. The Aryans, including defendant, went to Mansfield. After the riot,

officials found severe damage in L Section, disassembled bombs and booby traps, thousands of handmade weapons, and two inmate bodies, including that of David Sommers in L-7.

{¶ 35} In July 1994, a grand jury indicted defendant on four aggravated murder counts. Counts I and III charged prior calculation and design in the murders of Vallandingham and Sommers. Counts II and IV charged defendant with their murders in the course of kidnapping. Each murder count contained capital specifications that the murders occurred (1) while defendant was a prisoner in a detention facility, R.C. 2929.04(A)(4); (2) as part of a course of conduct, R.C. 2929.04(A)(5); and (3) during a kidnapping, R.C. 2929.04(A)(7). Additionally, Count V charged defendant with kidnapping Vallandingham. Earlier, a grand jury had indicted defendant on two counts of kidnapping Clark, and those counts were tried as Counts VI and VII.

{¶ 36} At trial, defendant defended on the theory that he led the Aryans only after Vallandingham was killed, that he did so to negotiate an end to the riot, that Lavelle and the BGD unilaterally killed Vallandingham, and that he was neither present at nor involved with Sommers's death. According to inmates Eddie Moss and Willy Johnson, Lavelle said that he killed Vallandingham. Moss and Johnson also saw Were scream at Lavelle for killing Vallandingham. Lavelle denied killing Vallandingham, although he admitted voting for a guard's death. Inmate Albert Klontz claimed that he was with defendant during the surrender process and that defendant could not have been present when Sommers was killed.

{¶ 37} The jury convicted defendant on Counts I and III, the aggravated murders with prior calculation and design of Vallandingham and Sommers, and Count II, the aggravated felony-murder of Vallandingham, together with all capital specifications except the R.C. 2929.04(A)(7) kidnapping specification in Count III. On Count IV, the jury convicted defendant of the lesser included offense of murder of Sommers. The jury also found defendant guilty, as charged, of kidnapping

Vallandingham and Clark in Counts V, VI, and VII. At the penalty hearing, the jury recommended the death penalty as to Counts I and III and life imprisonment on Count II. The trial court sentenced defendant to death for the aggravated murders of Vallandingham and Sommers (Counts I and III) and to consecutive prison terms for kidnapping Clark and Vallandingham.

{¶ 38} The court of appeals affirmed the trial court's judgment and death penalty. Defendant now appeals to this court as a matter of right.

———————————

*Mark E. Piepmeier*, Special Prosecuting Attorney, *William E. Breyer* and *Thomas P. Longano*, Assistant Special Prosecutors, for appellee.

*David J. Graeff* and *W. Joseph Edwards*, for appellant.

———————————

**LUNDBERG STRATTON, J.**

{¶ 39} In this appeal, defendant advances twenty-nine propositions of law. (See Appendix.) Finding none meritorious, we affirm his convictions. We have also independently weighed the aggravating circumstances against mitigating factors, and compared his sentences to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm the sentences of death.

I

PRETRIAL MOTION TO SUPPRESS

{¶ 40} In proposition of law I, defendant argues that FBI tunnel microphones and recorders installed during the siege, which intercepted and recorded inmate conversations, violated inmates' rights to private communications under R.C. 2933.51 *et seq.* as it existed before the 1996 amendments. See 141 Ohio Laws, Part I, 457. Thus, defendant argues that the trial court erred in not suppressing evidence from the tunnel tapes under former R.C. 2933.63. The court of appeals agreed that such evidence should have been suppressed, but found the error harmless.

**{¶ 41}** However, in our view, the trial court correctly rejected defendant's suppression motion, and the court of appeals erred in holding otherwise. Admittedly, the electronic interception and recording of oral conversations, as done here without a warrant, apparently fell within the ambit of the pre-1996 restrictions in R.C. 2933.51 *et seq.* See former R.C. 2933.52, 141 Ohio Laws, Part I, 461. The state contends that the prohibition against intercepting oral communications extends only to situations where there is a reasonable expectation of privacy, and rioting inmates could not have such an expectation. Defendant counters that privacy expectations were then irrelevant under Ohio's statutory scheme protecting communications. As defendant notes in his brief, the General Assembly "added a reasonable expectation of privacy requirement to the definition of 'oral communication' contained in R.C. 2933.51(B)" only when it amended the statute in 1996.

**{¶ 42}** We agree with the court of appeals that privacy expectations were not relevant to protections provided in the pre-1996 statutory scheme in former R.C. 2933.51 *et seq.* See *State v. Bidinost* (1994), 71 Ohio St.3d 449, 462, 644 N.E.2d 318, 328-329. Nonetheless, *Bidinost* involved communications by a cordless telephone, where legitimate expectations of privacy still exist. *Id.*

**{¶ 43}** However, we cannot reasonably interpret former R.C. 2933.51 *et seq.* as granting a statutory right to privacy in communications between rioting inmates. The General Assembly could not have envisioned creating such a right in a state prison under siege. Granting privacy rights in these circumstances makes no sense in view of the state's interest in operating a prison and, in this case, restoring order, saving the lives of hostages and nonrioting prisoners, and protecting state property. "[A] statute should not be interpreted to yield an absurd result." *Mishr v. Poland Bd. of Zoning Appeals* (1996), 76 Ohio St.3d 238, 240, 667 N.E.2d 365, 367, citing *State ex rel. Dispatch Printing Co. v. Wells* (1985), 18 Ohio St.3d 382, 384, 18 OBR 437, 439, 481 N.E.2d 632, 634.

11

**{¶ 44}** Nevertheless, we hold that former R.C. 2933.51 did not protect the inmate conversations in this case, but for an entirely different reason. Ohio law provided (and still provides) a specific statutory exception for federal electronic interceptions. Former R.C. 2933.52(B)(1) stated that Ohio restrictions on electronic interceptions do not apply to an interception that is "made in accordance with section 802 of the 'Omnibus Crime Control and Safe Street Act of 1968,' 82 Stat. 237, 254, 18 U.S.C. 2510 to 2520 (1968), as amended."

**{¶ 45}** In this case, FBI agents, acting under the authority of federal law, installed and monitored the electronic interception and recording devices that were used. Federal law explicitly defines "oral communications" as only those "exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." Section 2510(2), Title 18, U.S.Code. Accord *State v. Bidinost*, 71 Ohio St.3d at 462, 644 N.E.2d at 328. See, also, *United States v. Paul* (C.A.6, 1980), 614 F.2d 115, 117-120 (Phillips, J., concurring in judgment); *State v. Smith* (1997), 117 Ohio App.3d 656, 662, 691 N.E.2d 324, 327-328.

**{¶ 46}** Inmates generally, and rioting inmates in particular, have no right to expect any privacy in their cells. *Hudson v. Palmer* (1984), 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393, 402-403. The *Hudson* court held that the complete withdrawal from prisoners of certain rights is justified by the considerations underlying the penal system, "chief among which is internal security." *Id.*, 468 U.S. at 524, 104 S.Ct. at 3199, 82 L.Ed.2d at 401. Certainly, if security considerations justify the complete withdrawal of a prisoner's right ever to claim privacy in his cell, as *Hudson* held, then surely those considerations warrant the forfeiture of any claim to privacy for a prisoner who has left his cell to participate in a violent prison takeover. The idea that rioting prisoners are entitled to privacy in plotting the deaths of guards and other prisoners is absurd. Oral communications are protected under Section 2510(2), Title 18, U.S.Code, only if

they may justifiably be considered private. No such justification can possibly be claimed in this case.

{¶ 47} Defendant argues that only state law, not federal law, should control because the FBI was not at Lucasville to investigate civil rights violations. However, neither R.C. 2933.52(B)(1) nor Section 2510(2), Title 18, U.S.Code, makes any such distinction. Moreover, rioting inmates repeatedly claimed to the media that their civil rights were being violated. Inmates, including defendant, also repeatedly asserted in negotiations that they wanted to consult with FBI officials and wanted the FBI to oversee the negotiations and surrender to protect their civil rights.

{¶ 48} Since the authorities made the interceptions in accordance with Sections 2510(2) and 2511(1), Title 18, U.S.Code, those interceptions were necessarily and specifically exempt under R.C. 2933.52(B)(1), Ohio's statutory exception for federal interceptions made in accordance with those sections. Hence, we reject the court of appeals' conclusion that R.C. 2933.51 was violated by these FBI interceptions.

{¶ 49} We agree with the court of appeals' conclusion that admitting the tunnel tapes did not prejudice defendant's substantial rights. As that court noted, only tunnel tape 61 contributed to the state's case. However, several witnesses, including Lavelle, Snodgrass, Lomache, and Jenkins, independently testified that defendant voted for killing a guard at gang meetings. Even outside the meetings, defendant made repeated threats to kill a guard. Aside from tunnel recordings, detailed and substantial evidence established defendant's leadership of the Aryans, his directions to inmates during the siege, his relationship with gang leaders, and his involvement in kidnapping Clark and Vallandingham, the latter's murder, and the murder of Sommers. Thus, we reject proposition of law I.

## II

## EVIDENCE ISSUES

### *Other Acts Evidence*

{¶ 50} In proposition of law II, defendant first complains about the admission of evidence of criminal acts not charged against him. Admittedly, the state never charged defendant with or linked him to certain crimes, although it introduced evidence of these crimes, including (a) the murders of several white inmates early in the riots, (b) the attempted murder of Johnny Fryman, and (c) the murders of Pop Svette, Bruce Harris, and Earl Elder.

{¶ 51} However, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Here, the trial court did not abuse its discretion. This evidence helped prove a conspiracy, namely that prison gang leaders, including defendant, conspired over eleven days to seize and control L-complex, settle old scores, take hostages and even murder one, all in an attempt to force concessions from prison authorities. Several witnesses, *e.g.*, Snodgrass and Lavelle, provided "independent proof of the conspiracy." Evid.R. 801(D)(2)(e). Although the substantive offense of conspiracy was not charged, the state could prove a conspiracy in order to introduce out-of-court statements by conspirators in accordance with Evid.R. 801(D)(2)(e). See, *e.g.*, *State v. Duerr* (1982), 8 Ohio App.3d 396, 8 OBR 511, 457 N.E.2d 834*; State v. Milo* (1982), 6 Ohio App.3d 19, 6 OBR 44, 451 N.E.2d 1253.

{¶ 52} Additionally, evidence of the murders of the white "snitch" inmates helped explain defendant's motives in working closely with black inmates in the other gangs, Muslims and BGDs. Proving the murders of Harris and Elder and the attempted murder of Fryman demonstrated gang solidarity, control, and discipline, which was relevant to defendant's complicity as a gang leader. These murders were important events during the riot and siege, and were part of the setting of the case.

See *State v. Wilkinson* (1980), 64 Ohio St.2d 308, 316-317, 18 O.O.3d 482, 487-488, 415 N.E.2d 261, 268-269; *State v. Roe* (1989), 41 Ohio St.3d 18, 23-24, 535 N.E.2d 1351, 1358-1359. Further, since defendant was not implicated in these crimes, the evidence did not constitute "other acts" evidence proscribed by Evid.R. 404(B). Finally, the court carefully instructed the jury as to the limited use of this evidence.

{¶ 53} In proposition of law II, defendant also points to other evidence that did link him to uncharged crimes, and defendant claims that admitting such evidence violated Evid.R. 404(B). Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's criminal propensity. However, such evidence may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 54} Again, the trial court did not abuse its discretion. Evidence about gang symbols and beliefs, such as the significance of lightning bolts or the reference to "blood in, blood out," related to Aryan gang beliefs and traditions. Evidence of inmate Stiano's murder and the attempted murder of inmate Newell reflected a collective Aryan gang decision, demonstrating that gang's discipline and methods. The severe beating of Franklin Francis, ordered by Hasan, Lavelle, and defendant, reflected a collective decision by gang leaders to intimidate and discourage other inmates from escaping, which might end the siege and free the hostages.

{¶ 55} Defendant's threats to kill a guard or cut off a guard's hands help prove his intent to kill Vallandingham and fit squarely within the exceptions allowing admissibility in Evid.R. 404(B). *State v. Woodard* (1993), 68 Ohio St.3d 70, 73, 623 N.E.2d 75, 77-78. Evidence as to the guards' physical condition related to their kidnapping and status as hostages as well as the conspiracy. Other evidence demonstrated that defendant was directly involved with the capture of the guards and their detention.

{¶ 56} Nonetheless, evidence as to defendant's asserted purchase of marijuana at Lucasville, drug dealing at the Ohio State Reformatory in Mansfield, and the later hunger strike at Mansfield was questionable. Although of doubtful relevance, those relatively minor acts could not have prejudiced defendant and were harmless error. *State v. Gumm* (1995), 73 Ohio St.3d 413, 426, 653 N.E.2d 253, 266.

*Hearsay Statements*

{¶ 57} In proposition of law III, defendant argues that the trial court erred in admitting out-of-court statements by conspirators without first making "findings on the record" that a conspiracy existed, that the speakers were part of the conspiracy, and that the statements were made during and in furtherance of the conspiracy.

{¶ 58} Under Evid.R. 801(D)(2), hearsay does not include a statement offered against a party that is made "by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." In *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, at paragraph three of the syllabus, we recognized that "[t]he statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." See, also, *State v. Milo*, 6 Ohio App.3d 19, 6 OBR 44, 451 N.E.2d 1253. However, nothing in Evid.R. 802(D)(2)(e) requires that explicit findings be made on the record.

{¶ 59} In this case, the state established that the entire Lucasville drama involved a major conspiracy by inmate gang members. As the state points out, testimony from the first two witnesses established the conspiracy. Steven Macko described the gangs, their leaders, including defendant, the takeover of L Section, the capture of Vallandingham, the holding of other hostages, and defendant's involvement. Highway Patrol Sergeant Howard Hudson testified for several days

and provided an in-depth overview of the riot. Macko and Hudson's testimony provided the required preliminary prima facie showing of the conspiracy.

{¶ 60} Moreover, timing was unimportant and any discrepancy harmless, as we held in *State v. Carter*, 72 Ohio St.3d at 550, 651 N.E.2d at 972. Compelling independent evidence, aside from co-conspirator statements, established that inmate gang leaders, including defendant, conspired to take control of L Section at SOCF, hold hostages, and threaten and later kill a hostage. The gang leaders also used brutal force and intimidation to control other inmates.

{¶ 61} The record also satisfies the other Evid.R. 801(D)(2)(e) admissibility requirements for co-conspirator statements. Conversations between Skatzes, Cummings, and Hasan about killing a guard, or those between Were and another inmate about how Vallandingham was killed, clearly fall within the scope and in furtherance of the conspiracy. The asserted requirement to draw blood to become an Aryan related to the conspiracy among Aryan members. Conversations during gang meetings or between gang leaders also related to and furthered the conspiracy. Further, all of these conversations occurred after independent evidence proved the conspiracy. Hence, proposition of law III lacks merit.

*Declaration Against Interest*

{¶ 62} In proposition of law XXIII, defendant asserts that the trial court erred in refusing to admit an out-of-court statement made by Tony Taylor to the Highway Patrol. Inmate Taylor, subpoenaed as a witness, absolutely refused to testify, and after finding him in contempt, the trial court sentenced him to ninety days' imprisonment. Allegedly, Taylor witnessed events leading up to Vallandingham's death.

{¶ 63} We find no rule of evidence that would permit such a hearsay statement. The statement did not qualify as former testimony, Evid.R. 804(B)(1), since it was not taken in a hearing or at a deposition, nor did an opportunity exist for cross-examination. Further, Taylor's statement was not trustworthy, nor did it

qualify as a statement against interest. The statement suggests only that Taylor witnessed events leading to Vallandingham's death, not that he participated. Nor is Taylor's statement inconsistent with defendant's guilt, by complicity, of Vallandingham's murder. The trial court did not abuse its discretion. Evid.R. 804(B)(3); *State v. Sumlin* (1994), 69 Ohio St.3d 105, 630 N.E.2d 681; *State v. Patterson* (1996), 110 Ohio App.3d 264, 273, 673 N.E.2d 1001, 1006-1007.

### Cross-Examination

{¶ 64} In proposition of law XXII, defendant argues that the trial court erred when it declined to allow defendant to cross-examine Robert Brookover about details of his previous murder conviction in Arizona. Brookover testified about how he helped to kill Sommers, but claimed that he was forced to do so.

{¶ 65} Under Evid.R. 609, the jury was entitled to know in assessing Brookover's credibility that he had been convicted of a drug offense and first-degree murder and sentenced to death, a sentence later changed to life imprisonment. However, those facts were disclosed during direct examination.

{¶ 66} The court did not abuse its discretion in declining to allow cross-examination about the details of this Arizona conviction. Nothing in Evid.R. 609 requires that such cross-examination be permitted. "Under Evid.R. 609, a trial court has broad discretion to limit any questioning of a witness on cross-examination which asks more than the name of the crime, the time and place of conviction and the punishment imposed, when the conviction is admissible solely to impeach general credibility." *State v. Amburgey* (1987), 33 Ohio St.3d 115, 515 N.E.2d 925, syllabus. See, also, *State v. Wright* (1990), 48 Ohio St.3d 5, 548 N.E.2d 923.

{¶ 67} The facts of the Arizona conviction had no relevance to this case, even if Brookover had claimed that he was forced into that Arizona killing. By restricting such cross-examination, "the trial court can avoid the creeping effects of any undue prejudice against the witness and any unnecessary diversion."

18

*Amburgey*, 33 Ohio St.3d at 117, 515 N.E.2d at 927. Nor was defendant prejudiced by the trial court's refusal. The jury had all the information it needed to assess Brookover as a witness. Defendant's counsel conducted a wide-ranging and scathing cross-examination that attacked Brookover's testimony and credibility. Additionally, abundant other evidence reflected on Brookover's credibility. Accordingly, we reject proposition of law XXII.

*Gruesome Photographs*

{¶ 68} In proposition of law XXV, defendant asserts that the trial court erroneously admitted two autopsy photographs of Vallandingham and three crime-scene photographs of Sommers.

{¶ 69} Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. *State v. Landrum* (1990), 53 Ohio St.3d 107, 121, 559 N.E.2d 710, 726; *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. Relevant, nonrepetitive photographs in capital cases, even if gruesome, are admissible as long as the probative value of each photograph outweighs the danger of material prejudice to an accused. *Id.* at paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267, 273-274.

{¶ 70} The trial court did not abuse its discretion by admitting the Vallandingham autopsy photographs. These photographs illustrated the coroner's testimony, corroborated how Vallandingham died, and supported the state's evidence as to who killed him. Also, defendant's failure to object waived that issue. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

{¶ 71} Nor did the court err by admitting the three crime-scene photographs of Sommers's body. These photographs, limited in number, demonstrated the intent to kill of those who killed Sommers, corroborated the coroner's testimony, and corroborated Brookover's testimony, who was involved in killing Sommers.

Cf. *State v. Smith* (1997), 80 Ohio St.3d 89, 108-109, 684 N.E.2d 668, 687-688; *State v. Biros* (1997), 78 Ohio St.3d 426, 443-445, 678 N.E.2d 891, 907-908.

*Audiotapes*

**{¶ 72}** In proposition of law XXIX, defendant argues that the trial court erred in admitting tape recordings of the tunnel tapes, especially tape 61, because the tapes were partly inaudible.  Tape 61 involved an early morning April 15 meeting where a vote was taken to kill a guard.

**{¶ 73}** "To be admissible, a tape recording must be 'authentic, accurate and trustworthy.' " *State v. Coleman* (1999), 85 Ohio St.3d 129, 141, 707 N.E.2d 476, 488, quoting *State v. Rogan* (1994), 94 Ohio App.3d 140, 148, 640 N.E.2d 535, 540.  Whether to admit tape recordings that are partly inaudible rests within the sound discretion of the trial court.  *Coleman* at 141, 707 N.E.2d at 488.  See, also, *State v. Gotsis* (1984), 13 Ohio App.3d 282, 283, 13 OBR 346, 347-348, 469 N.E.2d 548, 551; *United States v. Haldeman* (C.A.D.C.1976), 559 F.2d 31(tape with unexplained gap held admissible); *United States v. Slade* (C.A.D.C.1980), 627 F.2d 293, 301 (tapes are admissible unless inaudibility renders tape as a whole untrustworthy).

**{¶ 74}** In this case, Lavelle, who was present at the meeting, authenticated the tape and interpreted its contents, and other evidence also established the tapes' authenticity.  Defendant had full opportunity to cross-examine Lavelle as to what was said or meant on the tapes.  The trial court did not abuse its discretion in admitting taped conversations of gang-leader meetings despite the background noises, and disjointed and multiple conversations.  As we previously held, "recorded tapes of actual events * * * should be admissible despite audibility problems, background noises, or the lack of crystal clear conversations, since they directly portray what happened." *Coleman* at 141, 707 N.E.2d at 488.  See, also, *State v. Rodriquez* (1990), 66 Ohio App.3d 5, 15-16, 583 N.E.2d 384, 391 (tapes of drug sales to informant admissible despite claims that they were "substantially

inaudible"); *Rogan,* 94 Ohio App.3d 140, 148-151, 640 N.E.2d 535, 540-542 (street tapes of drug sales); *State v. James* (1974), 41 Ohio App.2d 248, 70 O.O.2d 456, 325 N.E.2d 267 (tape of call to police during which murder occurred). Finally, any error relating to admitting the tapes did not prejudice defendant's substantial rights.

## III

## INEFFECTIVE ASSISTANCE OF COUNSEL

**{¶ 75}** In proposition of law IV, defendant argues that his counsel failed to provide effective assistance at trial. Reversal of convictions for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

**{¶ 76}** First, defendant complains because his counsel during opening statement asserted that defendant never would have agreed to kill Vallandingham because Vallandingham held "similar views" to defendant, and would "look the other way or warn [inmates] if there was a shakedown so that the inmates could hide their homemade booze, wine, and brew." In order to counter counsel's claim, the state introduced evidence that Vallandingham did not hold racist views, did not play favorites, and treated all inmates fairly and with respect and dignity.

**{¶ 77}** Nonetheless, we find that counsel's choice in opening statement to try this approach in an effort to deny any motive that defendant had to kill Vallandingham did not constitute ineffective assistance. Based on misinformation from his client, counsel may have believed that he could prove such claims. Although wrong in retrospect, counsel's tactical choice never fell "below an objective standard of reasonable representation." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. See *State v. Mason* (1998),

82 Ohio St.3d 144, 157, 694 N.E.2d 932, 948 (reviewing court "will not second-guess trial strategy decisions").

{¶ 78} Second, defendant argues that his counsel's waiver of trial-phase final argument also reflected ineffective assistance. However, defendant personally decided to waive final argument and therefore cannot be heard to complain about his own direction to his counsel. Moreover, defendant may have waived argument as a tactical decision to prevent the state from "staging a strong rebuttal." *State v. Burke* (1995), 73 Ohio St.3d 399, 405, 653 N.E.2d 242, 248. Accord *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24-25, 514 N.E.2d 394, 400-401. In this case, counsel made numerous pretrial motions, vigorously cross-examined witnesses, objected frequently during the state's case, and presented several defense witnesses. Thus, the record reflects a "strong, vigorous, and competent representation at the guilt phase." *State v. Ballew* (1996), 76 Ohio St.3d 244, 256, 667 N.E.2d 369, 380.

{¶ 79} Finally, as to the opening statement and the waiver of final argument, defendant has not demonstrated a "reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Evidence that Vallandingham treated inmates fairly could not reasonably have affected the trial result. Nor did the tactical decision to waive final argument make a difference after weeks of damaging testimony. Strong evidence proved defendant's guilt. We reject proposition of law IV.

IV

TRIAL-PHASE INSTRUCTIONS

*Conspiracy as Lesser Offense*

{¶ 80} In proposition of law XXI, defendant argues that the trial court erred in refusing to instruct on conspiracy to commit murder as a lesser included offense

22

to the charges of aggravated murder with prior calculation and design. However, we find no error.

{¶ 81} Conspiracy to commit aggravated murder is not a lesser included offense to aggravated murder because aggravated murder can be proved without proving conspiracy. See *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph three of the syllabus (an offense may be a lesser offense if the greater offense cannot ever be committed without the lesser offense also being committed).

{¶ 82} Even assuming that conspiracy were a lesser offense to aggravated murder, instructing on a lesser included offense is required "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. Accord *State v. Sheppard* (1998), 84 Ohio St.3d 230, 236, 703 N.E.2d 286, 293; *State v. Shane* (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272, 274-275.

{¶ 83} The evidence in this case could not reasonably support an acquittal on aggravated murder but sustain a conspiracy-to-murder charge. Defendant defended on the theory that he was not responsible in any way for the deaths of Vallandingham and Sommers. Thus, defendant was either responsible for their deaths and was guilty, or was innocent, and no lesser included offense instruction was appropriate. See *State v. Keenan* (1998), 81 Ohio St.3d 133, 139, 689 N.E.2d 929, 938 (ordinarily, when a defendant presents a complete defense, an instruction on a lesser included offense is improper); *State v. Solomon* (1981), 66 Ohio St.2d 214, 20 O.O.3d 213, 421 N.E.2d 139, paragraph two of the syllabus. If jurors had any doubt as to prior calculation and design, they could have found defendant guilty simply of murder since the trial court did instruct on murder as a lesser included offense in Counts I and III.

*R.C. 2929.04(A)(7) Specification*

{¶ 84} In proposition of law XXVI, defendant argues that the trial court improperly instructed the jury on the R.C. 2929.04(A)(7) death-penalty specification by combining the elements of principal offender and prior calculation instead of listing them as alternatives. The state responds that defendant failed to object and thus waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 85} However, the state at trial never claimed or suggested that defendant was a principal offender as that term is used in R.C. 2929.04(A)(7), *i.e.*, the actual killer. See *State v. Taylor* (1993), 66 Ohio St.3d 295, 308, 612 N.E.2d 316, 325. In the trial phase, the trial court instructed, as to the R.C. 2929.04(A)(7) specification, only on "prior calculation and design," and never referred to "principal offender" at all. Nor do the three death-penalty specification verdicts refer to "principal offender." Finally, the trial court's sentencing instructions do not use the term "principal offender" in referring to the death-penalty specification. Thus, proposition XXVI lacks any merit.

V

SUFFICIENCY OF EVIDENCE

{¶ 86} In proposition of law XXIV, defendant claims that the evidence is insufficient to support his conviction. In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 87} Here, defendant claims that the state proved only an uncharged conspiracy to commit murder and not the substantive offenses charged. However, the state never asserted that defendant personally killed Vallandingham and

Sommers, as the actual killer, but only that defendant was guilty under the law of complicity, R.C. 2923.03. Under R.C. 2923.03(A), no person shall (1) "[s]olicit or procure," (2) "[a]id or abet," (3) "[c]onspire with," or (4) "[c]ause" another to commit an offense. Those who commit these acts are guilty of complicity in the offense.

{¶ 88} The evidence demonstrated defendant's responsibility in soliciting, procuring, aiding, and abetting the kidnapping of Clark and Vallandingham, and the latter's murder. Defendant was both present and involved when Vallandingham was seized as a hostage. As the Aryan leader, defendant assigned jobs and issued orders to hold hostages, change their location periodically, and kill them if the prison were stormed. Aryans held Clark in cellblock L-2, the Aryan stronghold, and helped watch over Vallandingham.

{¶ 89} Defendant personally threatened several times to kill a guard if inmate demands were not immediately met. In gang meetings, defendant campaigned and voted for the death of a guard, and ordered inmates to knock out a window so they could kill a guard publicly. After Vallandingham's murder, defendant told Officer Hensley that "they" killed a guard because the state did not take them seriously and would kill another one if necessary. Inmates simply did what defendant, as the Aryan leader, encouraged, ordered, and directed. A gang leader cannot escape responsibility for crimes that he orders.

{¶ 90} The evidence also established defendant's guilt, by complicity, in Sommers's murder. Defendant and others discussed killing Sommers because he knew too much. After the Aryans decided to kill Sommers, defendant left and lured Sommers back into a deserted cell block where his fellow gang members then attacked Sommers. As their leader, defendant chose to stand by, on a catwalk out of harm's way, while gang members carrying out his orders stabbed Sommers and beat him to death with ball bats. Thus, the evidence shows that defendant solicited, aided in, and encouraged Sommers's murder. We reject proposition of law XXIV.

VI

PENALTY ISSUES

Death Penalty/Complicity

**{¶ 91}** In proposition of law VI, defendant essentially argues that one who is guilty of aggravated murder on the basis of complicity cannot receive the death penalty unless directly involved in the actual killing. We find that defendant's arguments lack merit.

**{¶ 92}** Defendant cites but misinterprets *Enmund v. Florida* (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140. *Enmund* simply held that the Eighth Amendment precludes the death penalty for "one * * * who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, *or intend that a killing take place* or that lethal force will be employed." (Emphasis added.) *Id.* at 797, 102 S.Ct. at 3376, 73 L.Ed.2d at 1151. In this case, the verdicts reflect that the jury found that defendant intended, with prior calculation and design, that Vallandingham and Sommers be killed. The jury also found that defendant intended that Vallandingham be killed in the course of a kidnapping.

**{¶ 93}** Defendant also mistakenly relies on *State v. Taylor*, 66 Ohio St.3d at 305-308, 612 N.E.2d at 324-325, which found insufficient evidence of "prior calculation and design" for both the aggravated murder conviction under R.C. 2903.01(A) and the related R.C. 2929.04(A)(7) specification, a problem not present here.

**{¶ 94}** The evidence established that defendant, as a gang leader, personally directed Vallandingham's capture and detention, ordered steps to preclude hostages from escaping, and ordered hostages to be killed if authorities recaptured the prison.

Defendant also repeatedly shouted to authorities that a guard would be killed if electricity and water were not turned on.

{¶ 95} On April 14 and 15, defendant campaigned for and voted for a hostage death. At the April 15 meeting, participants, including defendant, agreed that a guard would be killed unless inmate demands were met in ninety minutes. The demands were not met, and a guard was executed shortly thereafter. Defendant even told a guard that they had to kill a guard and would kill another if necessary. Thus, compelling evidence established that defendant intended Vallandingham's death on April 15.

{¶ 96} The evidence also supports defendant's participation in the Aryans' decision to kill Sommers. Defendant was present when Sommers was killed, having lured him into the cellblock where he was attacked.

{¶ 97} Finally, defendant's claim that one guilty of aggravated murder by complicity cannot receive the death penalty absent personal participation in the actual killing makes little sense. Under defendant's theory, the boss of a criminal enterprise, such as the Mafia, who repeatedly orders various murders could not receive the death penalty. Also, under defendant's theory, one who hires others to kill, but does not directly participate in the killing, could not receive the death penalty. That concept would nullify R.C. 2929.04(A)(2), which authorizes the death penalty for those who hire killers.

*Death Penalty/Conspiracy*

{¶ 98} In proposition of law VII, defendant argues that he was ineligible for the death penalty because he was convicted based only on conspiracy evidence, and was guilty only of conspiracy to commit murder, if anything at all. In fact, defendant was convicted on the basis of complicity. Under R.C. 2923.03(F), one guilty of complicity in an offense "shall be prosecuted and punished as if he were a principal offender." No basis exists for defendant's claim of ineligibility for the death penalty.

{¶ 99} Defendant's arguments in proposition XIII also lack merit. The evidence proved defendant's guilt, on the basis of complicity, including defendant's intention that both Vallandingham and Sommers be killed. We find no constitutional barrier to the death penalty for defendant.

VII

JURY ISSUES DURING PENALTY HEARING

{¶ 100} In propositions of law VIII and IX, defendant argues that the trial court erred in refusing to vacate the death penalty because of the course of jury penalty deliberations. To understand these issues, the following facts are relevant.

{¶ 101} During the third day of penalty deliberations, the foreman sent out a note that stated, "We have become deadlocked in our efforts to reach an evaluation as required by the charge. One juror [Katrina Fehr] has come into this with a conclusive—with a conclusion prior to the instruction. There is no willingness to evaluate the factors pro and con. This person made statements in direct conversation that the one—one of the possible findings would be not to sign. Other statements to this effect were made immediately upon entering the jury room prior to the start of deliberations. I request that this individual be disqualified."

{¶ 102} A second note from the jury, signed by eleven jurors, declared, "We have one juror, Katrina Fehr, who has, on numerous occasions, broken the rules of the court. She has made statements to several jurors before the end of the trial that she would not sign a death verdict.

"She reiterated this upon entering the jury room before the beginning of deliberations on phase two. She said as much to the foreman in the jury box before closing arguments in phase two.

"She obstinately refuses to understand complicity. This is not reasonable doubt. This has become personal and childish in all of our opinions. Said juror stated before the end of the trial that she had made up her mind and did not care what the rest of us thought. We would like her dismissed."

{¶ 103} The state asked the judge to excuse juror Fehr, but the defense objected. After briefly questioning the foreman in chambers, the court suspended jury deliberations and questioned each juror separately. When individually asked in chambers, each juror, except Fehr, stated that they agreed with the notes. Fehr, who had not previously seen the notes, denied refusing to deliberate or saying that she would not deliberate. She did admit saying, "I am not going to sign the death penalty, but I'm going to listen to what has been said." Over the state's objection, the court found insufficient cause to excuse Fehr.

{¶ 104} The court then advised the jury, "Ms. Fehr will not be excused. Can you continue to deliberate or are you unalterably deadlocked?" Later the foreman replied, "We cannot agree unanimously on either verdict." The court then instructed the jury using a modified *Howard* charge. See *State v. Howard* (1989), 42 Ohio St.3d 18, 537 N.E.2d 188. After deliberations, the jury asked if the judge could impose death or a life sentence even if they recommended death. The court responded, "Yes, so long as the jury does not act for the purpose of diminishing its responsibility." The jury then recommended death on Counts I and III and life imprisonment on Count II.

{¶ 105} Subsequently, defendant moved to vacate the death penalty with an attached affidavit from Fehr detailing jurors' inattentiveness and improper consideration of the issues. The court rejected this motion. In proposition VIII, defendant complains that the court should have vacated the death penalty or held an evidentiary hearing on Fehr's affidavit.

{¶ 106} However, a "firmly established common-law rule * * * flatly prohibit[s] the admission of juror testimony to impeach a jury verdict." *Tanner v. United States* (1987), 483 U.S. 107, 117, 107 S.Ct. 2739, 2745, 97 L.Ed.2d 90, 104 (refusing postverdict evidentiary hearing in which jurors would testify on juror misconduct despite juror claims of extensive drug and alcohol use by other jurors). Reflecting that principle, Evid.R. 606(B) restricts a juror's competence to testify

about "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him" with respect to the verdict "or concerning his mental processes in connection therewith."

{¶ 107} Here, Fehr's affidavit "seeks to introduce juror statements about the deliberative process," and "[t]his is precisely what Evid.R. 606 prohibits." *Tasin v. SIFCO Industries, Inc.* (1990), 50 Ohio St.3d 102, 108, 553 N.E.2d 257, 263. "[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." *Tanner*, 483 U.S. at 127, 107 S.Ct. at 2751, 97 L.Ed.2d at 110. That principle "protects the privacy of a jury's deliberations from inquiry and promotes the finality of jury verdicts." *State v. Mason*, 82 Ohio St.3d at 167, 694 N.E.2d at 955, citing *State v. Adams* (1943), 141 Ohio St. 423, 25 O.O. 570, 48 N.E.2d 861.

{¶ 108} Exceptions exist when an "extraneous influence" is involved. *Tanner*, 483 U.S. at 117, 107 S.Ct. at 2746, 97 L.Ed.2d at 104. Thus, under Evid.R. 606(B), a juror can testify about a threat, bribe, or attempted threat or bribe, or improprieties by a court officer. *Id.* However, no evidence, including Fehr's affidavit, supports claims of bribery or intimidation or any impropriety by any court officer. The court's careful voir dire of all jurors, including Fehr, did not constitute intimidation. The other jurors believed in good faith that Fehr was refusing to deliberate and could report that fact to the court. Jurors may report inappropriate juror behavior to the court *before* they render a verdict. *Id.* at 127, 107 S.Ct. at 2751, 97 L.Ed.2d at 110.

{¶ 109} Finally, this case involved no "extraneous prejudicial information" or "outside influence," as termed in Evid.R. 606(B). Information as to misconduct "must be from a source which possesses firsthand knowledge of the improper conduct." *State v. Schiebel* (1990), 55 Ohio St.3d 71, 75, 564 N.E.2d 54, 61. See, also, *State v. Adams*, 141 Ohio St. 423, 25 O.O. 570, 48 N.E.2d 861. Thus, in this

case the trial judge correctly found no evidence of improper outside influences that would justify applying the exceptions in Evid.R. 606(B).  See *State v. Rowe* (1993), 92 Ohio App.3d 652, 675, 637 N.E.2d 29, 43-44.  Proposition VIII lacks merit.

{¶ 110} In proposition IX, defendant argues that the trial court erred in rejecting his mistrial motion because the jury was deadlocked and the sentencing verdict was coerced.  At various points, the jury appeared to be deadlocked.  Nonetheless, the trial court properly allowed the jury to continue to deliberate until they reached a verdict.  The central issue is whether the entire chain of events produced a coercive effect on the jury.  In *Jenkins v. United States* (1965), 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957, the court held that a trial court's statement to a deadlocked jury "you have got to reach a decision in this case" had a coercive effect that negated the subsequent verdict.  The court in *Brasfield v. United States* (1926), 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345, found reversible error where a trial judge inquired of a jury, unable to agree, as to the extent of the numerical division.  Moreover, "[i]n Ohio, a solitary juror may prevent a death penalty recommendation."  *State v. Brooks* (1996), 75 Ohio St.3d 148, 162, 661 N.E.2d 1030, 1042.  If a jury cannot agree on a verdict of life or death, no retrial is necessary.  The judge simply imposes a life sentence.  *State v. Springer* (1992), 63 Ohio St.3d 167, 586 N.E.2d 96, syllabus.

{¶ 111} In this case, the court proceeded carefully and questioned the foreman, Fehr, and the other jurors with the minimum of intrusion, essentially to find out whether they agreed with the notes.  The judge needed to inquire so he could decide whether to excuse Fehr as the state requested.  Fehr was not singled out for questioning; all jurors were individually questioned.  No attempt was made to intimidate or coerce Fehr, and claims to that effect are pure speculation.  Fehr never claimed that she felt intimidated, and not even her affidavit claims that she was coerced or intimidated.  Further, the trial court accepted Fehr at her word, *i.e.,* that she was not refusing to deliberate, and rejected the state's challenge.

**{¶ 112}** Supplemental instructions, such as the modified *Howard* charge given here, are not coercive in a capital case when a jury reports an inability to agree on a sentencing verdict. See *State v. Mason*, 82 Ohio St.3d at 167, 694 N.E.2d at 955 (upholding modified *Howard* charge after four and one-half hours of deliberations); *State v. Loza* (1994), 71 Ohio St.3d 61, 81, 641 N.E.2d 1082, 1104 (upholding supplemental charge after "protracted period of time"); *State v. Tyler* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576 (pre-*Howard* supplemental instruction not coercive on second day of deliberations in penalty phase). In fact, the *Howard* charge is intended for a jury that believes it is deadlocked, so as to challenge them to try one last time to reach a consensus.

**{¶ 113}** Further, we find that the judge used appropriate caution in investigating the claim of juror misconduct. On this issue, we find instructive the words of the Second Circuit Court of Appeals in *United States v. Thomas* (1997), 116 F.3d 606:

"Courts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial. This undertaking is particularly sensitive where, as here, the court endeavors to investigate allegations of juror misconduct during deliberations. As a general rule, no one — including the judge presiding at a trial — has a 'right to know' how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror." *Id.* at 618.

**{¶ 114}** Where "a presiding judge receives reports that a deliberating juror is intent on defying the court's instructions on the law, the judge may well have no means of investigating the allegation without unduly breaching the secrecy of deliberations. * * * Rather, to determine whether a juror is bent on defiant disregard of the applicable law, the court would generally need to intrude into the juror's thought processes. Such an investigation must be subject to strict limitations. Without such an inquiry, however, the court will have little evidence

with which to make the often difficult distinction between the juror who favors acquittal because he is purposefully disregarding the court's instructions on the law, and the juror who is simply unpersuaded by the Government's evidence. Yet this distinction is a critical one, for to remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict. See [*United States v.*] *Brown* [(C.A.D.C.1987)], 823 F.2d [591] at 596." *Thomas* at 621.

**{¶ 115}** Accordingly, a juror cannot be removed if there is "any possibility" that fellow jurors' complaints about him or her are rooted in his or her view of the merits of the case. *Id.*

**{¶ 116}** We believe that the trial court in this case proceeded cautiously and appropriately in determining that juror Fehr should not be removed. Further, absent abuse of discretion, we will not second-guess the trial court's decision that a verdict was possible and that a deadlock could be avoided. As *Mason* noted, "[n]o exact line can be drawn" as to how long a jury must deliberate in the penalty phase before a trial court must limit the jury to a life verdict or take the case away from the jury. *Mason*, 82 Ohio St.3d at 167, 694 N.E.2d at 955.

**{¶ 117}** Moreover, the United States Supreme Court recognizes that the government has a " 'strong interest in having the jury express the conscience of the community on the ultimate question of life or death.' " *Jones v. United States* (1999), 527 U.S. 373, ___, 119 S.Ct. 2090, 2099, 144 L.Ed.2d 370, 383, quoting *Lowenfield v. Phelps* (1988), 484 U.S. 231, 238, 108 S.Ct. 546, 551, 98 L.Ed.2d 568, 578 (deadlocked jury need not be instructed on the consequences of failure to agree). Accordingly, we reject proposition of law IX.

## VIII
### TRIAL COURT OPINION

{¶ 118} In proposition X, defendant argues that the trial court's sentencing opinion failed to comply with mandatory procedures in R.C. 2929.03(F). Hence, he argues that his death sentence cannot be affirmed.

{¶ 119} First, defendant claims that the trial court failed to find specific mitigating factors. However, the trial judge evaluated defendant's background and mitigation evidence and found "[n]one of the above * * * mitigating in any way." For example, the court found defendant's "conduct during the riot" not mitigating, and thus found no mitigation in defendant's role in the negotiations. The trial court simply evaluated the evidence differently than defendant would have liked. We have repeatedly stressed that "the assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293, 305. See *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, at paragraph two of the syllabus; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, at paragraph two of the syllabus.

{¶ 120} Second, contrary to defendant's claims, the trial judge specifically delineated the aggravating circumstances. Also, the court, in discussing the facts of the crime and defendant's background, did not create nonstatutory aggravating circumstances. When a court correctly identifies the aggravating circumstance, "that court is presumed to rely only on that circumstance, and not on nonstatutory aggravating circumstances." *State v. Hill* (1995), 73 Ohio St.3d 433, 441, 653 N.E.2d 271, 279; *State v. Rojas* (1992), 64 Ohio St.3d 131, 142, 592 N.E.2d 1376, 1386.

{¶ 121} Third, the trial court clearly understood its responsibility by referring to the "heavy burden on the Court." Thus, the court did not simply rubber-stamp the jury verdict as defendant claims. The court's failure to sign the sentencing opinion was an unimportant omission, since the court signed the accompanying sentencing entry.

**{¶ 122}** Fourth, defendant complains that the trial court never explained why the aggravating circumstances outweighed mitigation. However, since the trial court found no mitigating factors, "[i]t logically follows that * * * the aggravating circumstance outweighed any mitigation." *State v. Lott*, 51 Ohio St.3d at 171, 555 N.E.2d at 305. Accord *State v. Byrd* (1987), 32 Ohio St.3d 79, 85, 512 N.E.2d 611, 618-619. Moreover, the court "may rely upon and cite the nature and circumstances of the offense" to support its finding that the aggravating circumstances outweighed mitigating factors. *State v. Stumpf*, 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus. Accord *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440-441, 650 N.E.2d 878, 883.

**{¶ 123}** Finally, our "independent review of a sentence will cure any flaws in the trial court's opinion." *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124, 131. Accord *State v. Reynolds* (1998), 80 Ohio St.3d 670, 684, 687 N.E.2d 1358, 1373; *State v. Hill* (1996), 75 Ohio St.3d 195, 210, 661 N.E.2d 1068, 1082. Accordingly, we reject proposition X.

XI

PENALTY INSTRUCTIONS

**{¶ 124}** In propositions XI, XVI-XVIII, XX, and XXVI-XXVIII, defendant claims error in the trial court's sentencing instructions. Defendant preserved some of these issues by objection or requests for instructions. However, as to propositions XI, XX, and XXVI, defendant's failure to object constitutes a waiver "unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

*Unanimity*

**{¶ 125}** In proposition of law XI, defendant claims plain error by asserting that the trial court instructed that the jury had to unanimously decide that death was inappropriate before it could consider life. Defendant is simply wrong; no such

35

instruction was given. Instead, the court instructed, "If you are not unanimously convinced * * * that the aggravating circumstances outweigh the mitigating factors, then you must choose one of the two life sentences. You shall sentence * * * to death only if you unanimously find * * * [aggravation outweighs mitigation]. If you do not so find, you shall unanimously [sign a life verdict.]"

{¶ 126} We have repeatedly rejected complaints about comparable language. *State v. Goff* (1998), 82 Ohio St.3d 123, 128-129, 694 N.E.2d 916, 921-922; *State v. Mitts* (1998), 81 Ohio St.3d 223, 233, 690 N.E.2d 522, 530; *State v. Davis* (1996), 76 Ohio St.3d 107, 116, 666 N.E.2d 1099, 1107. Moreover, this instruction correctly suggests that one juror could preclude the death penalty. The instruction given does not compare to that condemned in *Brooks*, which required the jury "to determine unanimously that the death penalty is inappropriate before you can consider a life sentence." *Brooks*, 75 Ohio St.3d at 159, 661 N.E.2d at 1040. Accord *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 95; *Davis*, 76 Ohio St.3d at 117, 666 N.E.2d at 1109.

{¶ 127} In proposition of law XX, defendant complains about the court's answer to a jury question. During deliberations, the jury asked, "[I]f we cannot reach a unanimous decision on the death penalty, then we must find for life in prison?" The court responded, "yes" and then reread parts of the instructions. The court also noted that a juror could refuse to sign a verdict he or she disagreed with, but declined to answer what would occur if jurors could not agree on a verdict.

{¶ 128} As noted, the court correctly instructed the jury on the unanimity point. *Goff*, 82 Ohio St.3d at 128, 694 N.E.2d at 921; *Mitts*, 81 Ohio St.3d at 233, 690 N.E.2d at 531. The jury was told that if they could not agree, they should go on to consider a life verdict. The jury need not be told the consequences of jury deadlock. *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370. Also, defendant agreed to this supplemental instruction and waived the issue. *State*

*v. Williams*, 51 Ohio St.2d 112, 5.O.O.3d 98, 364 N.E.2d 1364. We reject defendant's plain-error claims in propositions XI and XX as lacking merit.

*Verdict as Recommendation*

{¶ 129} In proposition of law XVI, defendant argues that the trial court erred in referring to the jury verdict as a recommendation over defendant's objection. The trial court's use of that term accurately stated the law and did not constitute error. See, *e.g.*, *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 656 N.E.2d 643, 669; *State v. Carter*, 72 Ohio St.3d at 559, 651 N.E.2d at 977-978. Moreover, the trial court also cautioned the jury, "You are not to construe the use of that word [recommend] to diminish your sense of responsibility in this case."

*Delineation of Other Factors*

{¶ 130} Defendant claims error in proposition XVII because the trial court declined to specifically list defendant's role in riot negotiations as a potential mitigating factor. However, counsel argued defendant's role in mitigation, and the jury was free to give it weight in mitigation as an "other factor." R.C. 2929.04(B)(7). A trial court need not elaborate as to what specific evidence may be considered "other factors" in sentencing instructions. *State v. Mitts*, 81 Ohio St.3d at 233-234, 690 N.E.2d at 531; *State v. Landrum*, 53 Ohio St.3d at 122, 559 N.E.2d at 727-728.

*Residual Doubt*

{¶ 131} Despite defendant's proposition XVIII, the court need not instruct on residual doubt. *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus; *State v. Chinn* (1999), 85 Ohio St.3d 548, 578, 709 N.E.2d 1166, 1189.

*Aggravating Circumstance*

{¶ 132} In proposition XXVI, defendant claims that the trial court's instructions referred to both principal offender and prior calculation. Defendant is wrong. No such instruction was given.

*Merger of Aggravating Circumstances*

{¶ 133} In proposition XXVII, defendant argues that the trial court erred in not merging death-penalty specifications in Counts I and III. The jury convicted defendant of the death specifications in both counts, except for an acquittal of the felony-murder specification in Count III.

{¶ 134} We hold that the trial court correctly declined to merge these separate specifications. The course of conduct, R.C. 2929.04(A)(5), and felony-murder, (A)(7), specifications in Count I are not duplicative and need not be merged. *State v. Smith* (1997), 80 Ohio St.3d 89, 116, 684 N.E.2d 668, 692; *State v. Palmer* (1997), 80 Ohio St.3d 543, 573-574, 687 N.E.2d 685, 710.

{¶ 135} Also, defendant's status as a prisoner represents a separate death specification, R.C. 2929.04(A)(4), from both the felony-murder death specification in Count I and course-of conduct specifications in Counts I and III. Defendant was an inmate long before he kidnapped guards and committed murders. His inmate status was not implicit in those acts. Thus, the specifications "did not arise from the same act or indivisible course of conduct." *State v. Frazier* (1991), 61 Ohio St.3d 247, 256, 574 N.E.2d 483, 490. See, *e.g.*, *State v. Bradley*, 42 Ohio St.3d at 149, 538 N.E.2d at 385-386 (inmate status and prior murder conviction treated as separate); *State v. Zuern* (1987), 32 Ohio St.3d 56, 66, 512 N.E.2d 585, 595 (inmate status and victim peace officer status treated as separate).

*Conspiracy*

{¶ 136} In proposition of law XXVIII, defendant argues that the trial court's trial-phase failure to instruct on conspiracy carried over and affected the jury's penalty verdict. However, defendant is mistaken. The trial judge correctly declined to instruct further on conspiracy except as necessary because of the evidence introduced. Defendant was neither charged nor convicted of conspiracy, and instructions on the elements of conspiracy could only have confused the jury.

{¶ 137} Defendant had no basis to request that the trial judge go through the evidence and identify statements admitted on the basis of conspiracy. Jurors need

not be told why a judge admitted evidence. Nor did jury questions about prior calculation and design or complicity indicate confusion over conspiracy. Thus, the trial court correctly instructed the jury, and jurors are presumed to have followed the trial court's instructions. *State v. Fears* (1999), 86 Ohio St.3d 329, 334, 715 N.E.2d 136, 144.

## X

## MISCELLANEOUS PENALTY ISSUES

### *Sentence Reduction/Proportionality*

{¶ 138} In proposition of law XII, defendant argues that he is being selectively punished by receiving the death penalty because he exercised his right to a jury trial. In contrast, Lavelle, who defendant argues was equally culpable, decided to cooperate, pled guilty to conspiracy to commit murder, and received a lesser penalty.

{¶ 139} However, defendant's claim of wrongful selective enforcement of the death penalty lacks merit. *State v. Jamison* (1990), 49 Ohio St.3d 182, 190-191, 552 N.E.2d 180, 188-189; *State v. Green* (1993), 66 Ohio St.3d 141, 151, 609 N.E.2d 1253, 1261. Any disparity is easily explained because Lavelle cooperated with the state's investigation into the riot and pled guilty to a conspiracy to kill Vallandingham. Also, others received the death penalty for offenses in the riot. See, *e.g.*, *State v. Sanders* (May 1, 1998), Hamilton App. No. C-960253, unreported, 1998 WL 212756; and *State v. Were* (Sept. 30, 1998), Hamilton App. No. C-950908, unreported, 1998 WL 682146. Finally, a proportionality review in Ohio includes only cases "in which the death penalty has been imposed." *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

### *Prosecutorial Misconduct*

{¶ 140} In proposition XIV, defendant argues that he was denied a fair trial by the prosecutor's inflammatory remarks during sentence argument. However,

with one exception, defendant failed to object to remarks he now complains about and waived all but plain error. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus; Crim.R. 52(B).

{¶ 141} First, defendant complains that the prosecutor referred to Vallandingham's killer "chok[ing] the life from him." The facts of the crime, however, are relevant to deciding the penalty. *Gumm*, 73 Ohio St.3d at 416-417, 653 N.E.2d at 259-260; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212, 218.

{¶ 142} Second, defendant complains that the prosecutor referred to Nuremberg war crimes and remarked, "unless we got the people that turned the gas on in the showers, we can't convict them." Here, the prosecutor briefly responded, without objection, to defendant's pleas for life because he was not the hands-on killer. Even if this argument was excessive, no plain error exists. "Not every intemperate remark by counsel can be a basis for reversal." *State v. Landrum*, 53 Ohio St.3d at 112, 559 N.E.2d at 718.

{¶ 143} Third, defendant complains that the prosecutor referred to defendant when he said, "I'll deal with the devil any day * * * to get at Satan." Here, the prosecutor was responding to defense claims that the state, in plea agreements with witnesses, made "deals with the devils." See *State v. Daniels* (1993), 92 Ohio App.3d 473, 490, 636 N.E.2d 336, 347. In any event, the court sustained the defense objection, thereby negating prejudice.

{¶ 144} Fourth, defendant argues that the prosecutor injected his personal opinion into the case. However, "[a] prosecutor may state his opinion if it is based on the evidence presented at trial." *State v. Watson* (1991), 61 Ohio St.3d 1, 10, 572 N.E.2d 97, 106. When viewed in its entirety, the prosecutor's sentencing argument was fair, did not contribute unfairly to the death verdict, and did not create outcome-determinative plain error. Cf. *State v. Hill*, 75 Ohio St.3d at 204, 661

N.E.2d at 1078; *State v. Landrum*, 53 Ohio St.3d at 111-112, 559 N.E.2d at 717-718.

*Signature of Judge*

{¶ 145} In proposition XV, defendant argues that his death penalty must be vacated because Judge Patrick McGrath signed the writ of execution when, in fact, retired Judge Thomas Mitchell presided over the case and sentenced defendant to death.

{¶ 146} However, signing the death warrant was a ministerial act, since Judge Mitchell had already imposed the death penalty and signed the sentencing entry. Crim.R. 25(B) permits another judge to be assigned a case if, "for any reason," the original judge "is unable to perform the duties of the court after a verdict." Although the file does not explain why another judge signed the writ, defendant still "has not contradicted the presumption of regularity accorded all judicial proceedings." *State v. Hawkins* (1996), 74 Ohio St.3d 530, 531, 660 N.E.2d 454, 455. Accord *State v. Sweet* (1995), 72 Ohio St.3d 375, 650 N.E.2d 450; *State ex rel. Tillimon v. Weiher* (1992), 65 Ohio St.3d 468, 469, 605 N.E.2d 35, 36.

{¶ 147} Moreover, the issue is moot since the October 13, 1995 date specified in the sentencing entry and writ has long since passed. Further orders would be needed for an execution to be carried out. We reject proposition XV.

*Nonstatutory Aggravating Circumstance*

{¶ 148} In proposition of law XIX, defendant argues that his "constitutionally protected conduct, under the right to assemble and the right to express," was improperly used as a nonstatutory aggravating circumstance in the penalty hearing.

{¶ 149} Defendant relies upon *Dawson v. Delaware* (1992), 503 U.S. 159, 160, 112 S.Ct. 1093, 1095, 117 L.Ed.2d 309, 314, which held that the Constitution "prohibit[s] the introduction in a capital sentencing proceeding of the fact that the defendant was a member of an organization called the Aryan Brotherhood, where

the evidence has no relevance to the issues being decided." However, *Dawson* recognizes that gang membership and beliefs may be admissible when relevant. Thus, "the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165, 112 S.Ct. at 1097, 117 L.Ed.2d at 317. See, also, *United States v. Easter* (C.A.9, 1995), 66 F.3d 1018 (gang affiliation relevant to identity); *O'Neal v. Delo* (C.A.8, 1995), 44 F.3d 655, 660-661 (prison gang membership relevant to motive behind inmate killing).

{¶ 150} In this case, *Dawson* has no application. *Dawson* involved an escaped convict who committed a murder and other crimes, and his gang membership was not relevant to those crimes. The evidence of Dawson's membership in a racist group was offered solely to prove his bad character. Here, defendant used his status as the Aryan gang leader to commit the crimes, by complicity. His leadership of the Aryan gang and his relations with other gang leaders were central trial-phase issues.

{¶ 151} Moreover, the trial-phase evidence admitted at sentencing, without objection, related to the facts of the aggravating circumstances, including defendant's status as an inmate, the "course of conduct" murders, and the kidnapping, as well as defendant's asserted mitigation that he only helped negotiate an end to the riot. See *State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus. In deciding on the death sentence, juries must also consider whether anything mitigating exists in the nature and circumstances of the offense. See *State v. Lorraine*, 66 Ohio St.3d at 420, 613 N.E.2d at 218.

{¶ 152} Here, the court's instructions and the prosecutor's argument correctly identified the statutory aggravating circumstances and did not use defendant's membership in the Aryan gang as an aggravating circumstance. See *State v. Clemons* (1998), 82 Ohio St.3d 438, 447, 696 N.E.2d 1009, 1018. Unlike

the prosecutor in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 358, 662 N.E.2d 311, 323, the prosecutor here did not refer to facts in the case as aggravating circumstances. Thus, we reject proposition of law XIX.

XI

CONSTITUTIONAL ISSUES

{¶ 153} We summarily reject defendant's challenge in proposition V to the constitutionality of Ohio's death penalty statutes. *State v. Goff*, 82 Ohio St.3d at 141, 694 N.E.2d at 930; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

XII

INDEPENDENT SENTENCE EVALUATION

*Evidence at Penalty Phase*

{¶ 154} At the penalty hearing, William Robb, defendant's father, testified that defendant grew up in a normal, stable family, with two older brothers and a younger sister in Dayton, Ohio. When he was thirteen, defendant became belligerent and was sent to live with his grandfather in California, where the family had lived before. After defendant returned and by the time he was fourteen or fifteen, defendant was using drugs, failing in school, and becoming involved in gangs. At age seventeen, defendant was convicted of voluntary manslaughter and sent to prison. His father does not believe that the death penalty would be fair to defendant.

{¶ 155} Diane Robb, defendant's mother, described defendant as always friendly toward people, and stated that he loved children, sports, and animals. At fourteen, defendant was sent to California because of bad influences in the neighborhood, but when he came back he was belligerent. When convicted of manslaughter, defendant had a "big problem * * * very bad on drugs." She still loves her son and believes that he could make a positive contribution to society.

{¶ 156} Julie Hinkle, defendant's California sister-in-law, who knew defendant before the family moved to Ohio, described defendant as a normal, affectionate child with no discipline problems. When in California, defendant could not adjust to his overly strict grandparents. While in prison, defendant wrote to his nephew (Hinkle's son), strongly warning him to stay away from drugs, which had been defendant's downfall. Holly Herman, defendant's friend, has multiple sclerosis, and writes defendant daily and has visited him. Herman described defendant as a very loving and caring person. Defendant has helped her tremendously, and she believes that he could help others if allowed to live.

{¶ 157} In an unsworn statement, defendant stated that he was born in 1967 and was twenty-seven years old, and that as a youngster he started experimenting with barbiturates and later tried LSD, Valium, and heavy drinking. By age fifteen, he was addicted to PCP and then sold drugs to pay for his habit. He shot and killed a man during a fight, and pled guilty to manslaughter, receiving a seven-to-twenty-five-year prison sentence. In prison, he quit drugs "cold turkey."

{¶ 158} Since he was of small stature, five feet five inches and one hundred forty-one pounds, when he went in prison, he joined the Aryans for protection. He also started exercising and working out, and also developed separatist racial attitudes. When the riot broke out, he was in his cell, and most of the rioters were black inmates. Defendant also described his decision, along with others, to stay in the L block, burning unit files, and other activities during the riot. He claims that Aryans took custody of Clark and Ratcliffe to protect these guards.

{¶ 159} Defendant claimed that he liked Vallandingham and never agreed to his death or the killing of a guard. Upon learning that one was killed, defendant became very upset and decided to help negotiate an end to the riot. Defendant also said that he "had nothing to do with David Sommers's death [and knew] nothing about it." In brief, he "didn't commit the crimes." He does not want to die and believes that he could be of use to others if allowed to live.

{¶ 160} Niki Schwartz, a Cleveland attorney, testified about the negotiations to end the riot and asserted that defendant was reasonable and selfless in negotiating, and "deserved a large part of the credit for the peaceful resolution of the riot."

*Sentence Evaluation*

{¶ 161} After independent assessment, we find that the evidence proves the aggravating circumstances charged against defendant beyond a reasonable doubt. As to both Counts I and III, defendant was a "prisoner in a detention facility," former R.C. 2929.04(A)(4), at the time of the murders. 139 Ohio Laws, Part I, 1, 14. As to both counts, the offense "was part of a course of conduct involving the purposeful killing of * * * two or more persons." R.C. 2929.04(A)(5). Finally, as to Count I, the offense was committed during a kidnapping. R.C. 2929.04(A)(7).

{¶ 162} As for mitigating factors, we find nothing mitigating in the nature and circumstances of the offenses. Defendant willingly participated in the unlawful takeover of a large section of an Ohio prison, and helped direct and control prisoner activities during the siege. During this riot, numerous inmates were killed and injured, guards were assaulted and held captive, and millions of dollars of property was destroyed. Nor does defendant's history, character, and background offer any significant mitigating features. Defendant still enjoys his family's love and they do not want him to be executed, but defendant has done nothing since he was a young teenager to warrant his family's respect. Cf. *State v. Fox*, 69 Ohio St.3d at 193-194, 631 N.E.2d at 132-133.

{¶ 163} Aside from R.C. 2929.04(B)(5), (B)(6), and (B)(7), we find the remaining statutory mitigating factors inapplicable. Since defendant was twenty-four or twenty-five at the time of the offenses, his youth under R.C. 2929.04(B)(4) was not significant. *State v. Palmer*, 80 Ohio St.3d at 576, 687 N.E.2d at 712; *State v. Brewer* (1990), 48 Ohio St.3d 50, 64, 549 N.E.2d 491, 505.

{¶ 164} In contrast, the R.C. 2929.04(B)(6) factor directly applies as a mitigating factor, since defendant's guilt was by complicity, and not as a principal offender. Nonetheless, we accord that factor very little weight under the circumstances, particularly in view of defendant's critical role as a gang leader.

{¶ 165} As to "other factors," R.C. 2929.04(B)(7), defendant suggests that his role in negotiating a peaceful end to the siege should be given substantial mitigating weight. We disagree. The entire series of events reflected adversely on the inmates and on their leaders, including defendant. We view defendant as a recalcitrant hardliner who enjoyed his brief role in thwarting state authorities. We will not reward him for finally agreeing to surrender. Defendant has shown no remorse; hence, that is not a factor.

{¶ 166} Based on the evidence, we find that the aggravating circumstances in Count I outweigh the mitigating factors beyond a reasonable doubt. The "course of conduct" and "prisoner" aggravating circumstances, especially when combined, are accorded very serious weight. Additionally, the murder occurred in the course of kidnapping. Even when all of defendant's asserted mitigation is added together, it is of virtually no weight when compared with these aggravating circumstances. Defendant's voluntary and vicious participation in the takeover of SOCF and the ensuing murders strike at the heart of society's efforts to protect itself from predators. The sentence of death is appropriate in this case.

{¶ 167} As to Count III, we find that the aggravating circumstances of defendant's status as an inmate and his "course of conduct" also merit the death penalty. Defendant's actions show that he was a predator, not only regarding state prison officials, but also as to other inmates who helped him and trusted him. Again, his offered mitigation merits little weight.

{¶ 168} We find that the death penalty in this case is appropriate, and we find that penalty to be proportionate when compared with similar capital cases. On murders by inmates, see *State v. Stojetz* (1999), 84 Ohio St.3d 452, 705 N.E.2d 329;

*State v. Carter* (1992), 64 Ohio St.3d 218, 594 N.E.2d 595; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373; *State v. Zuern*, 32 Ohio St.3d 56, 512 N.E.2d 585. As to "course of conduct" murders, see, *e.g.*, *State v. Clemons*, 82 Ohio St.3d 438, 696 N.E.2d 1009; *State v. Keith* (1997), 79 Ohio St.3d 514, 684 N.E.2d 47; *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960; *State v. Allard* (1996), 75 Ohio St.3d 482, 663 N.E.2d 1277. As to felony-murder cases of kidnapping, see, *e.g.*, *State v. Joseph* (1995), 73 Ohio St.3d 450, 653 N.E.2d 285; *State v. Simko* (1994), 71 Ohio St.3d 483, 644 N.E.2d 345; *State v. Scudder* (1994), 71 Ohio St.3d 263, 643 N.E.2d 524; *State v. Fox*, 69 Ohio St.3d 183, 631 N.E.2d 124.

{¶ 169} Accordingly, the judgment of the court of appeals, upholding defendant's convictions and sentence, is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

———————————

APPENDIX

{¶ 170} "*Proposition of Law One*: The trial court committed reversible and judicial error by overruling a defense motion to suppress evidence of oral and wire communications obtained in violation of Defendant's rights under R.C. 2933.52(A), as well as Section 14, Article I of the Constitution of the State of Ohio and the Fourth and Fourteenth Amendments to the United States Constitution.

{¶ 171} "*Proposition of Law Two:* The Defendant-Appellant was deprived of his right to a fair trial and his due process rights under both the United States and Ohio Constitutions when the State introduced evidence of other acts of the Defendant-Appellant and alleged co-conspirators that were prejudicial in nature and by the presentation of other evidence that was improperly admitted.

{¶ 172} "*Proposition of Law Three:* The Defendant does not receive a fair trial consistent with the State and Federal Constitutions when the trial court fails to make findings on the record that alleged co-conspirators' hearsay statements were made during and in furtherance of a conspiracy or that a conspiracy in fact existed or that Defendant was part of said conspiracy.

{¶ 173} "*Proposition of Law Four:* Defendant was denied the effective assistance of counsel as guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

{¶ 174} "*Proposition of Law Five:* Imposition of the death sentence violates the Sixth, Eight[h], and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶ 175} "*Proposition of Law Six:* When evidence is presented by the prosecution on the theory of complicity, the penalty of death is precluded when the conduct at issue is not constitutionally sufficient to support the capital offense of aggravated murder — the first step statutorily required before considering capital specifications, contra the Eighth and Fourteenth Amendments to the Constitution.

{¶ 176} *"Proposition of Law Seven:* When the trial court makes a finding that Jason Robb was tried and convicted as a conspirator, the death penalty is precluded pursuant to the Eighth and Fourteenth Amendments to the Constitution and the sentence by the trial court cannot be imposed.

{¶ 177} "*Proposition of Law Eight:* The trial court commits prejudicial error in overruling a motion to vacate the death sentence and refuses to hold an evidentiary hearing when the record reveals jury intimidation and coercion, contra the Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 178} *"Proposition of Law Nine:* The trial court commits prejudicial error when it overrules a motion for mistrial at the mitigation hearing where the

record clearly demonstrates the jury was deadlocked and the verdict was coerced, contra the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 179} *"Proposition of Law Ten:* (a) The trial court commits prejudicial error, in a capital case, when it fails to file a separate opinion properly detailing the reasons for following the jury's recommendation, thus subverting the reliability process required for review contra the Eighth and Fourteenth Amendments to the Constitution. (b) When the opinion filed by the trial court is totally lacking in the statutory requirements of R.C. 2929.03(F), the failure to comply constitutes reversible error and the sentence cannot stand.

{¶ 180} "*Proposition of Law Eleven:* Plain error occurs at the mitigation phase when the jury is given an improper instruction on unanimity contra the Eighth Amendment to the Constitution.

{¶ 181} *"Proposition of Law Twelve:* Comparative proportionality review compels a sentence reduction when the evidence reveals the policy of the government was to selectively enforce a capital sentence against the accused for exercising his right to a jury trial while a government witness involved in the conspiracy was given a minimal sentence contra the Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 182} "*Proposition of Law Thirteen:* When the accused is tried as a conspirator, the trial court cannot impose a sentence of death, under the Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 183} "*Proposition of Law Fourteen:* The accused does not receive a fair trial, and a mistrial should have been granted, when the prosecutor inflames the passions of the jury in closing arguments at the mitigation stage by comparing the accused to Adolph Hitler and Satan and stressing the heinous nature of the offenses contra the Sixth, Eighth and Fourteenth Amendments to the Constitution and Article I, Section 10 of the Ohio Constitution.

{¶ 184} "*Proposition of Law Fifteen*:  Where the writ in a capital case is signed by a different judge, the imposition of the penalty of death is precluded by the Eighth and Fourteenth Amendments to the Constitution.

{¶ 185} "*Proposition of Law Sixteen*:  When the jury is led to believe by the trial judge that their decision is only a recommendation and there is reliance on this, the accused's sentence of death cannot constitutionally stand contra the Eighth and Fourteenth Amendments to the Constitution.

{¶ 186} "*Proposition of Law Seventeen:*  The trial court commits prejudicial error in refusing to instruct the jury that they can consider as a mitigating factor, the role of Jason Robb during the negotiations resulting in the conclusion of the riot contra the Eighth and Fourteenth Amendments to the Constitution.

{¶ 187} "*Proposition of Law Eighteen:*  The trial court commits prejudicial error in refusing to give jury instructions on residual doubt at the mitigation hearing.

{¶ 188} "*Proposition of Law Nineteen:*  When the constitutionally protected conduct, under the right to assemble and the right to express, is used as an aggravating circumstance, the sentence of death cannot stand since it is violative of the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 189} *"Proposition of Law Twenty:*  When the jury, while deliberating, requests further instructions on an [*sic*] unanimous verdict, the trial court errs to the prejudice of the accused when it gives an improper response, contra the Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 190} *"Proposition of Law Twenty-One:*  The trial court commits prejudicial error in the first phase of a capital case when it refuses to give an instruction on a lesser included offense to aggravated murder, contra the Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 191} *"Proposition of Law Twenty-Two:*  The trial court commits prejudicial error in refusing to permit cross-examination regarding details of a previous murder by a key witness of the prosecution when the proffer demonstrates

similar conduct to his murder of an inmate, contra the Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 192} *"Proposition of Law Twenty-Three:* When a witness, called for the defense, refuses to testify and is declared unavailable, the trial court commits prejudicial error in refusing to admit his previous statement implicating Anthony Lavelle in the murder of the officer, contra the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 193} *"Proposition of Law Twenty-Four:* The evidence is insufficient as a matter of law to support the conviction for aggravated murder and murder.

{¶ 194} *"Proposition of Law Twenty-Five:* When photographs of the deceased are introduced that serve no purpose other than to inflame the passions of the jury, the accused does not receive a fair trial consistent with the Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 195} *"Proposition of Law Twenty-Six:* When an improper jury instruction is given on the felony-murder specification, and the jury relies on this improper instruction, the sentence of death must be vacated under the Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 196} *"Proposition of Law Twenty-Seven:* The trial court commits prejudicial error in overruling a request to merge the aggravating circumstances at the mitigation hearing, contra the Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 197} *"Proposition of Law Twenty-Eight:* The trial court commits prejudicial error in a capital case by refusing to give an instruction on key evidence presented at trial, resulting in the jury asking questions during their deliberations that show they were confused as to the proper state of the law, contra the Sixth, Eighth and Fourteenth Amendments to the Constitution.

{¶ 198} *"Proposition of Law Twenty-Nine:* The trial court commits prejudicial error in refusing to exclude audiotapes that are unintelligible, contra the Fifth, Sixth and Fourteenth Amendments to the Constitution."