OPINION
Defendant, Wallace L. Ooten, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of felonious assault. Defendant raises the following four assignments of error:
 [1.] Appellant's conviction for felonious assault as charged in count four of the indictment is not supported by the evidence and is against the manifest weight of the evidence.
 [2.] The court erroneously overruled a defense objection to testimony by the state's expert as to what the "law holds."
 [3.] The evidence established as a matter of law that appellant was not guilty by reason of insanity. The jury's guilty verdicts are not supported by the evidence and are against the manifest weight of the evidence.
 [4.] The court erroneously sentenced appellant to consecutive sentences in excess of the maximum sentence for the most serious offense on which he was convicted.
For purposes of this appeal, the following facts are undisputed. Defendant was indicted for two counts of attempted murder, three counts of felonious assault, and associated firearm specifications. All charges were the result of an incident which occurred on July 12, 1999.
At about 4:30 p.m. on July 12, defendant's neighbor, Barbara Conn, observed defendant destroying his wife's car which was parked in the couple's driveway. After he had broken out the windows of his wife's car, defendant went back inside his residence, and shortly thereafter Ms. Conn noticed defendant leave with his wife in defendant's truck.
At approximately 5:45 p.m., Gregory Dearing, who was riding on his motorcycle, stopped in westbound traffic on Interstate 70 just west of Columbus. At trial, he explained that he was waiting in traffic when a pickup truck came down an entrance ramp "at a very high rate of speed." (Tr. 102.) He continued:
 * * * It was weaving erratically. As it went, in order to avoid the traffic, it went on up the berm and began going up the berm and making contact with the concrete barrier as it went.
 As I was watching, it went on down the berm, going out of sight, and it was slowing down. I was concerned at the time, I wasn't really sure what was going on, but I thought someone was injured or in need of assistance.
 So I went ahead and pulled out on my motorcycle and went down the berm after him. As I approached the vehicle, it became obvious that there was a struggle going on inside. There was a man in the driver's seat. There was a woman in the passenger's seat, and she was being struck repeatedly.
 They had come to a stop, and she opened her door and tried to get out. He grabbed her and pulled her back in the vehicle. She went for the horn, beeped the horn a few times, went for the door again. It was obvious that she was in trouble, trying to escape and trying to draw attention to them. [Tr. 71-72.]
Mr. Dearing eventually stopped behind defendant's vehicle in order to approach and render assistance. However, when he did so, defendant exited and acted in a threatening manner. Dearing testified: "I didn't want to be there when he got to me. I went ahead and put my motorcycle back in gear, and I took off." (Tr. 75.) As he did so, defendant attempted to block his way and punched him in the head as he passed by. Defendant then re-entered his truck and accelerated towards Dearing. Dearing managed to allude defendant, and after a short while, stopped at Mt. Carmel Hospital where he summoned the Columbus Police.
The reporting officer relayed Dearing's information, including the license plate number of defendant's vehicle, to the Whitehall Police Department. Thereafter, Whitehall officers, James Cook and John Dickey, arrived at defendant's home in separate patrol cars. When they arrived, Officer Cook approached the front door. At that moment, Officer Dickey observed defendant's wife exit a side door which led to a carport at the side of the couple's home. Upon seeing Mrs. Ooten, Officer Dickey approached.
As Officer Cook continued toward the front porch, defendant stood just inside the door of his home. When he reached the front porch and stood at the threshold of the door, defendant, who had a pistol in his hand, immediately opened the door, and without any words being spoken, aimed his pistol at Officer Cook's head and fired.
Officer Cook testified:
 As I walked to the front door, I seen Mr. Ooten just looking at me. I'm looking at him. We're in eye contact. I get up to the porch. It's a small concrete porch. I get up on it. Both my feet touch it. I look at him.
 The next thing I see is the barrel of a pistol at my forehead. I was able to duck as a round went off. He tried for my head first. I was able to duck, hit the concrete, and at that point, I could just hear shots being fired from behind me and getting struck.
* * *
 I went into survival mode at that point. I wasn't able to get to my weapon. I fell to the ground and scurried across the yard at that point. [Tr. 127, 129.]
As Officer Cook crawled across defendant's lawn, defendant walked behind him firing shot after shot into his body. Officer Dickey testified:
 We proceeded up the driveway towards the residence. I was walking behind Officer Cook. At that point, we observed a male subject in the front doorway of the home, and as we got closer to the house, a female subject exited the side door of the residence.
* * *
 As I approached the female, I heard several gunshots coming from the direction of the front of the house. I turned, and as I turned, I saw Officer Cook go across towards the driveway of the residence, and at that point I observed the suspect following behind Officer Cook.
* * *
 Officer Cook appeared to be running, stumbling, falling across the ground. It appeared to me that he was attempting to seek cover at that point. [Tr. 157, 159.]
When the shooting began, Officer Dickey drew his weapon and took cover behind a parked vehicle. That vehicle was hit by a bullet (or bullets) fired from defendant's weapon.[1] Officer Dickey ultimately returned fire, wounding defendant. Officer Dickey then secured defendant's weapon and radioed for assistance. Officer Cook was rushed to Grant Hospital where bullets and bullet fragments were removed from his right leg, right bicep, chin, and head. Defendant was placed under arrest and transported under guard to be treated for a bullet wound to his groin.
In his first assignment of error, defendant complains that his conviction for felonious assault upon Officer Dickey stands against the sufficiency and weight of the evidence. Sufficiency is a term of art used to describe that evidence which, as a matter of law, is legally sufficient to support a conviction. State v. Thompkins (1997),78 Ohio St.3d 380, 386. Sufficiency is synonymous with adequacy. When reviewing a conviction challenged on the basis of insufficient evidence, the evidence must be construed in a light most favorable to the prosecution, and the reviewing court must determine whether any rational trier of fact could have found each of the essential elements of the crime proven beyond a reasonable doubt. State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, unreported.
Conversely, when reviewing a verdict challenged to be against the manifest weight of the evidence, we must examine the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence the trier of fact clearly lost its way and, further, created such a manifest miscarriage of justice that the judgment or conviction must be reversed. As set forth in Thompkins, supra, the "manifest weight" of the evidence is:
 * * * "[T]he inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." [Emphasis sic.] [Id. at 387, citing Blacks Law Dictionary (6 Ed. 1990) 1594.]
The Ohio Supreme Court continued:
 * * * "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." [Id. at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.]
Defendant claims that his conviction should be reversed because there was no "testimony" that defendant fired shots toward Officer Dickey. We disagree.
When defendant began shooting Officer Cook, Officer Dickey took cover behind the right front corner of an Isuzu Amigo, the first of three cars parked in defendant's driveway. At trial, both Officer Dickey, as well as investigating Sergeant Mark Newcomb, explained that the Isuzu was located toward or in line with the front corner of defendant's home. The evidence also unequivocally proved that the front of defendant's home faced south, and that when defendant began shooting, Officer Cook fled south followed by defendant as he exited the front door of the residence.
As defendant chased Officer Cook, he placed himself south of Officer Dickey's position. Thus, when defendant and Officer Dickey exchanged gunfire, Officer Dickey fired south toward defendant, while defendant turned away from Officer Cook in order to fire north toward Officer Dickey. In addition to the testimony given, there is no question that at least one bullet, proven to have been fired from defendant's .38-caliber revolver, was recovered from the left rear quarter panel of the Isuzu.
When viewed in a light most favorable to the prosecution, a rational juror could easily find from the evidence presented that defendant, despite his protestations, fired at least one, if not several shots at Officer Dickey. There is no doubt that a rational trier of fact could have found each of the essential elements of the crime proven beyond a reasonable doubt. Conley, supra.
Moreover, a reversal of a conviction as being against the manifest weight of the evidence is an act reserved for only the most "exceptional case in which the evidence weighs heavily against the conviction." Thompkins, supra, at 387. In the present case, as in any other case, it was for the trier of fact to judge the credibility of the witnesses and evidence and to give appropriate weight to each. State v. DeHass (1967), 10 Ohio St.2d 230 . Having carefully and closely reviewed the entire record, and having independently weighed the evidence and judged the credibility of the witnesses, we are unconvinced that the jury clearly lost its way. Accordingly, defendant's first assignment of error is overruled.
In his second assignment of error, defendant complains that the trial court erred when it failed to sustain an objection raised after a comment made by the state's expert as to what the "law holds." In his defense, defendant argued that he was not guilty by reason of insanity. In support of this defense, defendant called two psychologists to testify, Drs. Chris Khellaf and James Reardon, while the state called one, Dr. Daniel Davis. During the course of Dr. Davis's questioning, the following exchange occurred:
 Q. [Assistant prosecutor] Okay. At some point in his [defendant's] interview, did he tell you something about put your gun — he was recalling at the time of the events that you should put your gun down, you shouldn't have a gun in the presence of the police?
 A. [Dr. Davis] Yes, sir. And I will go back to the discussions of whether or not the symptoms are real or not real, to me, is not as germane or important as his statements that, for example, right here he knows that he is in a situation where what he's doing is wrong.
 Put the gun down. Why would you think that? What other reason would you do that if it was not wrong to have a gun in front of the police? There is nothing to say that a mentally ill person can't, as well, know the wrongfulness of their actions.
 A person can hear voices, a person can see things, but as long as they know what they're doing is wrong, the law holds that they have not met the test of insanity.
 [Defense counsel] Pardon me. I'm objecting to any further testimony by the psychologist as a legal expert. He can talk about what he knows about what he's charged with, but he's interpreting Ohio law, and we've heard enough of that.
* * *
 [Assistant prosecutor] Judge, to render his evaluation, he has to apply his evaluation to Ohio law. I don't know how he can do that without referring to Ohio law.
[The Court] I'll overrule. [Tr. 1189-1190.]
Defendant argues that this one isolated comment, and the trial court's decision to overrule defense counsel's objection thereto, demonstrates that the court allowed Dr. Davis to explain or instruct the jury on Ohio law, that it endorsed Dr. Davis's opinion as to what Ohio statutory and common law holds, and that it also abdicated its responsibility to instruct the jury on the law controlling their deliberations.
The admission or exclusion of relevant evidence rests within the sound discretion of the trial court, as does the court's ruling upon evidentiary objections. State v. Robb (2000), 88 Ohio St.3d 59, 68, quoting State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Absent an abuse of discretion, as well as a showing that the accused has suffered material prejudice, an appellate court will not disturb a ruling by a trial court as to the admissibility of evidence. State v. Martin (1985), 19 Ohio St.3d 122, 129. An abuse of discretion connotes more than an error of law or judgment and implies that the court's attitude is clearly and palpably unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
Dr. Davis was qualified as an expert forensic psychologist in this case. As defendant must and does in fact concede, it was entirely proper for Dr. Davis to express his opinion as to whether or not defendant satisfied the statutory definition of legal insanity as set forth in R.C. 2901.01. It is clear from the record that Dr. Davis at no time attempted to instruct the jury on Ohio law. To the contrary, the trial court properly performed this function at the conclusion of the presentation of evidence. We find no indication that the trial court's decision to not strike this isolated comment from the record amounted to an abuse of discretion. Accordingly, defendant's second assignment of error is overruled.
In his third assignment of error, defendant argues that the evidence established as a matter of law that he was not guilty by reason of insanity. Stated alternatively, defendant maintains that his conviction is against the manifest weight of the evidence.
R.C. 2901.01(A)(14) provides that:
 A person is "not guilty by reason of insanity" relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts.
Insanity is an affirmative defense, and, therefore, the burden of proving that defense by a preponderance of the evidence lies with the defendant. Moreover, the weight to be given the evidence, as well as the credibility of the witnesses concerning the defense of insanity in a criminal proceeding, are questions and decisions primarily for the trier of fact. State v. Thomas (1982), 70 Ohio St.2d 79.
In this matter, the jury heard all of the evidence and concluded, based upon that evidence, that defendant, despite his protestations, did indeed understand the wrongfulness of his conduct that afternoon. The mere fact that defendant produced two psychologists who opined that he did not understand the wrongful nature of his conduct certainly does not establish the defense of insanity as a matter of law. The jury acted within its discretion when it chose to believe the testimony and expert opinion of Dr. Davis, who testified that defendant understood the wrongfulness of his conduct when he shot at Officers Cook and Dickey. See Vetter v. Hampton (1978), 54 Ohio St.2d 227. Having carefully reviewed the record, the jury's verdict was supported by sufficient evidence and is not against the manifest weight of the evidence. Defendant's third assignment of error is therefore overruled.
In his fourth and final assignment of error, defendant complains that he was incorrectly sentenced as the record allegedly fails to support the trial court's imposition of consecutive sentences. Ohio law provides trial courts with broad discretion when sentencing within the statutory guidelines. State v. Cassidy (1984), 21 Ohio App.3d 100, 102. In order to lawfully impose consecutive sentences, a trial court must act within the guidelines set forth in R.C. 2929.14(E)(4), which provides, as follows:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
The trial court conducted a sentencing hearing on January 22, 2001. At that time, the court stated that it had carefully studied the record, including the pre-sentencing investigation. After hearing the argument of counsel on the issue of sentencing and mitigation, the court continued:
 * * * [T]he Court has had the benefit of listening to all of the testimony that was presented in [this] case, I am going to impose on Counts Three and Four a sentence of nine years on each count.
 I am not going to impose the minimum sentence on the case because, quite frankly, I believe that that would demean the seriousness of this offense. Anytime an individual takes a gun and starts shooting at two other individuals, putting at risk not only their lives but also other people's lives — Mr. Ooten's wife was there. The houses in that neighborhood were close by. There was testimony in the case of individuals at the dinner table telling their children to get down on the floor because they didn't know what was going on.
 So, quite clearly, a minimum term on this case would demean the seriousness of this offense. The Court is also going to order that those sentences be served consecutively, and the reason that I am going to do that is because it is certainly not disproportionate to the seriousness of the conduct that is involved in this case, and also I believe that no single term of imprisonment would adequately reflect the seriousness of the offense that was involved here. [Tr. 1546-1547.]
In addition to the foregoing, in its judgment entry, the court explained:
 The Court further finds that the consecutive sentences are necessary to protect the public from future crime and to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. The Court further finds that:
 (1) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
In reviewing the trial court's sentence for statutory compliance, we can look to the court's statements made in open court, the court's sentencing entry, as well as the record as a whole. See State v. Hess (May 13, 1999), Franklin App. No. 98AP-983, unreported; State v. Belfon (July 13, 2000), Franklin App. No. 99AP-663, unreported.
The evidence presented at trial proved that the events leading up to the July 12, 1999 shooting began earlier that day when defendant and his wife had an argument. Defendant responded to that argument by going outside and smashing the windows of his wife's car. Not long thereafter, the two left in defendant's truck. According to the motorcyclist, Gregory Dearing, he observed defendant repeatedly punching his wife as defendant sped by him crashing and sliding along the freeway barrier bordering Interstate 70. When Mr. Dearing stopped to render assistance, defendant attacked Mr. Dearing and punched him in the head as he attempted to escape. Defendant then returned home and secured a loaded revolver fully anticipating that the police would come to his home as a result of the incident with Mr. Dearing.
When Officers Cook and Dickey arrived, defendant stood inside the front door to his dimly lit house. Seeing the two officers, defendant waited for Officer Cook to walk to the front door when he suddenly, without provocation, and without a word being spoken, pointed his revolver at Officer Cook's head and fired. Clearly, if defendant had connected with his first shot, Officer Cook would be dead. Defendant then chased Officer Cook across the yard, firing at him as Officer Cook fled on his hands and knees. As noted, Officer Cook was hit several times and sustained serious injuries. Defendant also attempted to shoot Officer Dickey, but was unsuccessful in that effort.
In closing, we note that Officers Cook and Dickey were there to check on the welfare of defendant and his wife, and both nearly paid with their lives. In light of the foregoing, we conclude that the trial court adhered to the statutory requirements when it sentenced defendant. Accordingly, defendant's fourth assignment of error is overruled.
Having overruled all four of defendant's assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
BROWN and BRYANT, JJ., concur.
[1] It was also determined that the vehicle had been hit by a bullet (or bullets) from Officer Dickey's weapon.