[Cite as *State v. Shuba*, 2011-Ohio-5135.]

STATE OF OHIO, MAHONING COUNTY
IN THE COURT OF APPEALS
SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NOS. 09 MA 185 |
| | ) | 09 MA 186 |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | |
| | ) | OPINION |
| MICHAEL A. SHUBA | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| MICHAEL J. FILL | ) | |
| | ) | |
| DEFENDANTS-APPELLANTS | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeals from the County Court
No. 4 of Mahoning County, Ohio
Case Nos.      09CRB177AUS
                      09CRB178AUS

JUDGMENT:                                  Affirmed.

APPEARANCES:
For Plaintiff-Appellee:                   Atty. Paul J. Gains
                                                   Mahoning County Prosecutor
                                                   Atty. Ralph M. Rivera
                                                   Assistant Prosecuting Attorney
                                                   21 West Boardman Street, 6th Floor
                                                   Youngstown, Ohio  44503

For Defendants-Appellants:           Atty. Terry H. Gilbert
                                                   600 Standard Building
                                                   1370 Ontario Street
                                                   Cleveland, Ohio  44113-1752

                                                   Atty. Rhys B. Cartwright-Jones
                                                   42 N. Phelps Street
                                                   Youngstown, Ohio  44503-1130

JUDGES:
Hon. Cheryl L. Waite

Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated: September 29, 2011

WAITE, P.J.

{1} Appellants, Michael J. Fill and Michael A. Shuba, appeal the judgment of the Mahoning County Court No. 4, convicting Fill of menacing, a violation of R.C. 2903.22, a misdemeanor of the fourth degree, and Shuba of aggravated menacing, a violation of R.C. 2903.21(A), a misdemeanor of the first degree, and possession of criminal tools, a violation of R.C. 2923.24(A), a misdemeanor of the first degree, in these consolidated cases. For the following reasons, Appellants' convictions are affirmed.

{2} Appellants were involved in a confrontation with an off-duty police officer from the Boardman Police Department ("BPD"), Jack Cochran, on the afternoon of January 31, 2009 on a residential street in Austintown, Ohio. According to Cochran's testimony, Appellants cursed at him, threatened him, and Shuba approached him waving a walking stick in a threatening manner, causing Cochran to draw his weapon in self-defense. According to Shuba's testimony, though, Cochran brandished his weapon without provocation.

{3} In this appeal, Appellants contend that the trial court erred when it failed to sanction the state for its failure to provide notice of its intent to call a witness, Paula Salen, to testify at trial, and that the jury's verdicts were against the manifest weight of the evidence. Appellants further contend that the trial court erred when it

required them to post an appellate bond in this misdemeanor case, and when it admitted improper impeachment testimony on rebuttal.

{4} According to Cochran's testimony, he was driving on Timberbrook Drive, which becomes Timber Lane, in Austintown, Ohio at approximately 1:00 p.m. on January 31, 2009. There was snow and ice on the road, and he was traveling approximately 5 miles below the posted limit of 25 miles per hour. He noticed Shuba's white van following very closely behind him. After stopping at the stop sign at the intersection of Timber Lane and Bentwillow, Cochran began to turn left (north) onto Bentwillow Lane, when the white van pulled along the driver's side of his SUV, cut him off, and made a left turn.

{5} Cochran testified that both vehicles travelled along Bentwillow, until the van, which was now in front of him, stopped in the middle of the road approximately two to three car lengths from Cochran's SUV. He claims that Appellants exited the van and began cursing at him for talking on his mobile phone and driving too slowly. Shuba exited from the driver's side and Fill exited from the passenger's side. The men walked to the back bumper of the van and stopped. Cochran got out of his SUV and stood by the driver's side door.

{6} According to Cochran, he tried to explain that he was driving slowly because of the road conditions, then he told the men that "enough is enough" and that they should "[g]et in [their] van and let [him] get on [his] way." (Tr. Vol. I, p. 164.) Although Shuba told Fill to get back in the van, Fill did not move. Instead, Fill told

Cochran that he looked cocky and that he needed "[his] ass beat" and that Fill "was going to fuck [him] up." (Tr. Vol. I, p. 164.)

**{7}** According to Cochran, when Shuba directed Fill to get into the van, he told Cochran that Cochran was "about to get [his] ass beat by both of [them]." (Tr. Vol. I., p. 165.) The men approached Cochran, but stopped midway between the back bumper of the van and the front bumper of the SUV. Cochran testified that after Shuba told Fill to get back into the van, Cochran said, "[t]hat's some good advice. You guys need to go." (Tr. Vol. I., p. 166.) Shuba responded, "[n]ow you're really going to get fucked up." (Tr. Vol. I., p. 166.) Shuba turned back to the van, reached in, and took out a club, which was three or four feet in length. Cochran testified that, when he saw Shuba return to the van, he thought the confrontation was over, so he got back into his SUV. However, after Shuba retrieved the club, he "was coming at [Cochran] like he was a man on a mission." (Tr. Vol. I., p. 167.) Cochran unholstered his weapon, pointed it at Shuba, and said, "[d]on't take another step closer." (Tr. Vol. I., p. 167.) Shuba dropped the club and ran.

**{8}** Shuba ran between the vehicles, through the snow, and up to one of the houses. Cochran sat in his SUV as he watched Shuba run south through the neighboring yards. Shuba came back into the street behind Cochran's SUV and slapped his hand on the back of the vehicle. Cochran thought Shuba was attempting to open the tailgate.

**{9}** At this point, Cochran backed his SUV up the street to a stop sign to get away from Shuba, and called the Austintown Police Department ("APD"). At the

same time, Shuba pulled the van he was driving into one of the driveways and, as he ran into the attached garage of the residence, he yelled "someone call 911." (Tr. Vol. I., p. 169.) Appellants walked in and out of the garage, and then Shuba walked over to Cochran's SUV to read the license plate.

{10} Cochran testified that he believed that Shuba now had a gun, because only an armed man would approach another armed man. When Officer Keith Smith, a patrol officer from APD, arrived at the scene, Cochran waited until Smith spoke with Appellants and then he told his version of the events to Smith.

{11} On cross-examination, Cochran testified that he never identified himself as a police officer during the confrontation with Appellants. He further testified that, although he identified the instrument in Shuba's hand as a "club" during his direct testimony, it was actually a walking stick. Finally, Cochran noted that he did not call APD for assistance, but, instead, to ask them to run the license plate on the van and to warn the dispatcher that she would probably be receiving a 911 call.

{12} Shuba testified that he uses the walking stick because he has a chronic cartilage disease that has affected both knees, his left knee most severely, and he is too young to get a knee replacement. (Tr. Vol. II., pp. 58, 62.) He denied ever using the walking stick as a weapon. He also testified that he suffers from coronary artery disease, and that he suffered a heart attack approximately two years before the trial. (Tr. Vol. II., p. 60.) As a result, he claimed that he has been advised to avoid stressful situations. He further testified that he has a black belt in karate, which he

earned in the 1980s, and that it would be inconsistent with his discipline and training to assault someone without provocation. (Tr. Vol. II., p. 64.)

{13} According to Shuba, he and Fill were on their way to Shuba's parents' house to pick something up. (Tr. Vol. II., p. 65.) He testified that when he came up to Cochran's vehicle on Timber Lane, the SUV was travelling five miles an hour. (Tr. Vol. II., p. 66.) Cochran's vehicle stopped at the stop sign at the intersection of Timber Lane and Bentwillow for approximately 30 seconds. Shuba testified that he honked his horn twice, and then the SUV "pulled up a little bit and turned right." (Tr. Vol. II., p. 67.) Shuba turned left at the intersection.

{14} As Shuba and Fill travelled south on Bentwillow, Shuba noticed Cochran's SUV coming up behind his van at a high rate of speed. Shuba drove past his parents' driveway, so he could back in the driveway. Before he could do so, Cochran pulled up, even with the Shubas' driveway, approximately 30 feet behind Shuba's van. Shuba exited the van with his walking stick. He conceded that he used a thicker stick in the wintertime for better traction. Cochran asked what his problem was. Shuba responded that he had no problem but that Cochran should "get off [of his] cell phone and drive correctly." (Tr. Vol. II., p. 71.) Then, Shuba and Fill got back in the van. Shuba denied yelling, cursing, or waving the stick. In fact, he testified that the roads were icy so that he needed to use both hands on the walking stick that day to steady himself.

{15} Because he could not back into his parents' driveway, and neither he nor Fill had a cell phone, Shuba decided to try to walk up the driveway to call the

police to avoid another confrontation with Cochran. Fill agreed to walk around the back of the van, and help Shuba walk up the driveway. When they got out of the van the second time, Shuba did not have the walking stick. According to Shuba, when he and Fill exited the van, Cochran brandished the gun, and said, "I will shoot you dead right here in the street." (Tr. Vol. II., p. 73.)

{16} Shuba claimed that Fill began running up the driveway, and that Shuba had to say, "[w]ait for me. Help me up." (Tr. Vol. II., p. 74.) As the two men hurried up the driveway, Cochran walked to the end of the driveway and pointed the gun at them. When Appellants got to the garage, Cochran continued to point the gun at them. Shuba testified that Cochran never identified himself as a police officer.

{17} When Shuba reached the door of the residence, he called to his mother to dial 911. Shuba left the house after his mother called 911, because he was afraid for his parents' lives. Shortly thereafter, Shuba's mom came out to the garage to give Fill a pencil and paper to write down Cochran's license plate number.

{18} At some point, Cochran yelled to Shuba that he was leaving. Concerned that they would not be able to identify Cochran if he left the scene, Shuba and Fill walked back down the driveway, then to Cochran's car to record the license plate number. Shuba claimed that he had to wipe dirt from the license plate in order to read it. He also claimed that Cochran kept putting the SUV in reverse, and then back into drive, and that when Shuba was copying the license plate, Cochran put the SUV in reverse and "the tire was spinning and he caught just the edge of [Shuba's] foot." (Tr. Vol. II., p. 83.)

**{19}** When Officer Smith arrived on the scene, he saw Appellants standing outside of the van, which was parked in the driveway. Shuba testified that Appellants moved the van into the driveway after Cochran backed down the street to the stop sign. While Smith was taking Appellants' statements, Shuba started complaining about chest pain.

**{20}** When Appellants returned to the house, Shuba was sweating profusely and experiencing chest pain. When paramedics arrived, Shuba initially refused treatment. He claimed he did so because he was uninsured. Smith testified that Shuba was very uncooperative with his investigation. (Tr. Vol. I., p. 137.) Shuba was hospitalized for three days, but he was not aware of the "brush burns" on his foot until he left the hospital. (Tr. Vol. II., p. 83.)

**{21}** According to the paramedic that transported Shuba to the hospital, Fill was permitted to accompany Shuba to the hospital. In the ambulance, Fill told Shuba that Cochran was a Boardman police officer, and that he should call a lawyer. Tammy Templin, another emergency medical technician that treated Shuba, testified that Fill expressed contempt for both APD and BPD. (Tr. Vol. I., p. 91.)

**{22}** The paramedic, Jacqueline Dick, related comments by Shuba regarding his belief that Boardman police were not prosecuted for crimes they committed, so it was clear that he and Fill would have to "take care of it themselves." (Tr. Vol. I., p. 106.)

**{23}** The Chief of the BPD interviewed Shuba and Fill approximately 25 minutes after the confrontation, and told them that if they wanted to pursue charges

that had to contact APD. (Tr. Vol. II., p. 86.) Shuba prepared a statement and submitted it to APD a few days after he was released from the hospital. Later, with the assistance of Paula Salen, a private investigator, he submitted a police report.

{24} Appellants were convicted and sentenced on November 3, 2009. Fill was sentenced to 30 days in jail, with 27 days suspended, a $150 fine and court costs, and 12 months of community control. Shuba was sentenced to 90 days in jail, with 87 days suspended, a $150 fine and court costs, and 12 months of community control. Both Shuba and Fill filed separate appeals on November 5, 2009. The two appeals were consolidated on December 22, 2009.

First Assignment of Error

{25} "Prosecutorial Misconduct: The prosecution failed to provide Crim.R. 16 materials and surreptitiously commandeered the defense's investigator by abuse of the subpoena process."

{26} Appellants contend that the trial court abused its discretion when it did not sanction the state for its failure to identify Paula Salen as a government witness. Salen is a private detective employed by Shuba to investigate matters relating to this case. Salen also prepared Shuba's statement to the police.

{27} Crim.R. 16(I), captioned: "Witness List," reads, in pertinent part, "[e]ach party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal." Neither party provided a witness list to opposing counsel in this case. (Tr. Vol. I, p. 14.)

**{28}** The trial court has broad discretion in regulating discovery. *State v. Scudder* (1994), 71 Ohio St.3d 263, 269, 643 N.E.2d 524, 529-530. When a party fails to comply with Crim.R. 16, the trial court may order compliance, grant a continuance, exclude evidence that has not been disclosed, or "make such other order as [the trial court] deems just under the circumstances." Crim.R. 16(L)(1). When a discovery violation occurs, the trial court should impose the least severe sanction that is consistent with the purposes of the discovery rules. *Lakewood v. Papadelis* (1987), 32 Ohio St.3d 1, 511 N.E.2d 1138.

**{29}** According to the trial transcript, Salen sat at Appellants' table during voir dire. Prior to the commencement of testimony, the state subpoenaed Salen, then objected to Salen's presence at Appellants' table. Appellants argued that the state subpoenaed Salen during voir dire for the sole purpose of preventing her from sitting at Appellants' table during the trial. (Tr. Vol. I, p. 11.) Appellants further argued that the jury would be confused because she was at their trial table during voir dire, but not during the trial, and that the only testimony that she could provide was that she wrote Shuba's statement to the police. In response to Appellants' arguments, the trial court stated:

**{30}** "Listen. I don't disagree with anything you're saying. If she is a witness and she investigated the case and he intends to call her, I can't let her sit here. I don't disagree with anything you said, but I can't stop him from trying his case the way he wants to. As a result, I'll ask [Salen] to leave the courtroom. * * * I don't think

what [the state] did was appropriate. I don't think [Salen] was subpoenaed in good faith. I think it was sneaky, but I don't have any choice." (Tr. Vol. I, pp. 12-14.)

**{31}** Appellants' counsel asked the trial court, "[a]nd what happens if he doesn't call her? Are you going to hold him in contempt?" (Tr. Vol. I, p. 12.)

**{32}** Appellants argue that the trial court's statements indicate that, although it believed that the state had acted in bad faith, it did not believe that it had the power to sanction the state. However, the state correctly argues in its brief that the most severe sanction that the trial court could have imposed in this case for a Crim.R. 16 violation was the exclusion of Salen's testimony. Salen did not testify in this case. Consequently, as far as the alleged violation of Crim.R. 16 is concerned, Appellants were not prejudiced by the trial court's failure to sanction the state. Accordingly, Appellants' first assignment of error is overruled.

Second Assignment of Error

**{33}** "Manifest Weight: The manifest weight of the evidence supported acquittal."

**{34}** Appellants contend that the weight of the evidence in this case does not support the guilty verdict. More particularly, Appellants argue that they presented a better case than the state, and that the jury should not have convicted them. In determining whether a criminal judgment is against the manifest weight of the evidence, an appellate court acts as a "thirteenth juror" to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins* (1997), 78

Ohio St.3d 380, 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. The verdict is not against the weight of the evidence when there is evidence which, if believed, will convince the average person of the accused's guilt beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 172, 383 N.E.2d 132. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of syllabus.

{35} R.C. 2903.21(A), captioned: "Aggravated menacing," reads, "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person* * * ." R.C. 2903.22(A), captioned: "Menacing," reads, in pertinent part, "[n]o person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person* * *." R.C. 2923.24(A), captioned: "Possessing criminal tools," reads, "[n]o person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally."

{36} Appellants contend that Officer Cochran's testimony was incredible based on his admitted failure to immediately report the incident to APD or his superiors. Whether or not this single aspect of Cochran's testimony undermined its credibility was for the trier of fact to determine. Shuba and Fill's testimony, on the other hand, had many aspects that made their version of the events difficult to believe. A prime example is the testimony that Shuba and Fill walked back to Cochran's SUV to record his license plate number after Cochran brandished a gun

and threatened to kill them. As the state observed on cross-examination, it is difficult to understand why Shuba's mother would encourage Fill to walk down the driveway to get Cochran's license plate number, when she knew that Cochran had a gun. Equally unbelievable is the fact that Shuba (who testified that he has a heart problem and difficulty walking without his walking stick) and Fill (who Shuba testified was so afraid that he initially left Shuba to run up the driveway) left the safety of the garage to get the license plate number of an armed man who supposedly threatened to shoot them dead over a traffic incident.

{37} In this case, the jury was asked to accept one of two diametrically opposed stories. Although neither story may have warranted complete belief, we cannot conclude that the jury lost its way in giving more weight to Cochran's version of the events at issue in this case. Accordingly, Appellants' second assignment of error is overruled.

<u>Third Assignment of Error</u>

{38} "Bond: The trial court erred in requiring the defendants to post a cash or surety appellate bond in a misdemeanor case."

{39} Appellants contend that the trial court ordered an illegal appellate bond in this case. Local Rule I(B)(2) of the Seventh District Court of Appeals deals with bail and suspension of sentence on appeal, and states: "[i]f the defendant is on bail when such a notice of appeal is filed, the execution of the sentence shall thereby be suspended and the defendant shall continue on the same bail during the pendency of the appeal unless the magistrate or this Court, for good cause shown, orders a new

or additional bond R.C. Section 2953.051 [subsequently renumbered as R.C. 2953.03]." Appellants contend that the trial court did not articulate good cause when it ordered a $5,000.00 cash or surety bond following notice of appeal in this case. The state argues that the trial court did not abuse its discretion, and that the issue is not ripe because Appellants never posted the bonds.

{40} Appellants' argument is not correct. Appellants were not released on bail when this case was appealed. They had been released on a bail bond during the pendency of the trial, but such a bond is only valid until the verdict is rendered or it is otherwise continued by the trial court. Crim.R. 46(H); see also, *State v. Barnes*, 6th Dist. No. S-10-025, 2011-Ohio-799, ¶28. There is no indication in the final judgments under review in this appeal that the trial court continued the bonds when final judgment was rendered. Therefore, Appellants were not on bail when they filed their appeals and Local Rule I(B)(2) does not apply.

{41} Generally, a criminal defendant must first apply to the trial court to have a sentence suspended and to set bail pending appeal. App.R. 8(B). Appellants did so in this case. After they filed their appeal, they requested that the trial court suspend the sentence during the appeal. Appellants were not satisfied with the result of their motion, in that the trial court increased their bond to $5,000. Various criminal rules and statues give the trial court discretion to change the bond on appeal, and R.C. 2949.04 then allows a court of appeals to reduce or increase the bond for good cause. The proper method to challenge the trial court's ruling regarding bail and suspension of sentence on appeal is through a motion made to

the court of appeals pursuant to App.R. 8(B). See *State v. Jackson* (May 9, 2001), 7th Dist. No. 99CO57. Appellants did not file such a motion with us and the matter is now moot since the appeal has ended by the issuance of our judgment. Accordingly, we must overrule Appellants' third assignment of error.

Fourth Assignment of Error

**{42}** "Improper Impeachment: The trial court erred in allowing in incongruent, unnoticed, impeachment testimony."

**{43}** Appellants offered the testimony of two witnesses to establish that Shuba is a truthful, peaceful person. Concetta Precurato testified that Shuba was "very mild mannered," and never "disrespectful." (Tr. Vol. II, p. 50.) Max Ciscell, Shuba's partner in a karate school for children, testified that Shuba was "never enraged or aggressive" and that he was a "reputable person." (Tr. Vol. II, pp. 30-31.)

**{44}** In rebuttal, the state offered the testimony of Jason Herman. The state characterized Herman's testimony as a "road rage" incident involving Appellants. Herman testified that he was driving in front of Shuba and Fill on Route 46 in Austintown, Ohio, when Shuba swung around Herman's car, cut Herman off, and then almost immediately applied his brakes. (Tr. Vol. II, p. 124.) Herman claimed that he almost hit Shuba's car, and that Herman's wife and children, who were passengers in his car, were thrust forward and then back in their seats.

**{45}** Herman followed Shuba into a parking lot and confronted him. When Herman asked Shuba for an explanation as to why he cut him off and then applied

his brakes, Shuba responded that "he's been doing this for 15 years and [he was] going to sue [Herman]. He enjoys doing this." (Tr. Vol. II, p. 126.)

{46} Herman testified that he was furious, and that while he was "ranting and raving," one of the men in Shuba's car began taking photographs for "evidence." (Tr. Vol. II, p. 126.) The confrontation concluded when Herman "showed [Shuba] the moon" and the police intervened. (Tr. Vol. II, pp. 126-127.)

{47} Appellants contend that Herman's testimony was incongruent with the reputation testimony offered by the defense. Appellants argue that, because Shuba did not act angrily or violently toward Herman, the evidence should not have been admitted. Appellants claim that, "[i]ndeed, if one believes this line of testimony, Shuba and Fill would have appeared nonchalant—far from violent or non peaceable [sic]. The key phrase, '[He said] *he enjoys doing this.*' " (Emphasis in original.) (Appellants' Brf., p. 32.)

{48} Appellants predicate the first part of their argument on Evid.R. 404(A)(1), which reads, in pertinent part, "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same is admissible * * *." It is well established that the admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Robb* (2000), 88 Ohio St.3d 59, 68, 723 N.E.2d 1019. Absent an abuse of discretion, an appellate court will not disturb a ruling by a trial court as to the admissibility of evidence. *State v. Martin* (1985), 19 Ohio St.3d 122, 129, 483 N.E.2d 1157. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or

unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{49} Appellants offered testimony to establish that Shuba was non-violent and respectful of others. Herman's testimony demonstrated that Shuba had a proclivity for aggressive, reckless, and confrontational driving, and thus, it directly contradicted the testimony that Shuba was a peaceful and respectful person once he was behind the wheel of a car. The fact that Shuba may also have enjoyed the results of his aggressive and disrespectful behavior is irrelevant. A person may express enjoyment in any number of ways, many of which are not particularly peaceful. As a consequence, the trial court did not abuse its discretion based upon Evid.R. 404(A)(1) when it admitted the Herman testimony.

{50} Next, Appellants contend Mr. Herman's testimony violated Evid.R. 608(B), which states: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid. R. 609, may not be proved by extrinsic evidence." Seeing that the testimony of Mr. Herman did not relate to Appellants' character for truthfulness, but rather, their character for peacefulness and respectfulness, Evid.R. 609 does not apply.

{51} Finding neither of Appellants' arguments persuasive, we overrule their fourth assignment of error.

{52} At this point we note that there may be another problem with this testimony. The concurrence is partially correct that the testimony may have been

offered to show prior bad acts of Appellant Shuba, and to that extent would be offered erroneously pursuant to Evid.R. 405(A). However, there are two separate reasons why this does not matter to our conclusion. First, we do not, as a rule, sua sponte raise and make an argument for a party that the party has not raised. Second, as the concurrence admits, even if we were to sua sponte make additional arguments for Appellant, there is nothing of record to support a necessary finding of prejudice. Thus, while we note the possible error, it has no impact on our decision.

**{53}** In summary, we conclude that the trial court's failure to sanction the state for the Crim.R. 16 violation did not prejudice Appellants and the jury's verdicts were not against the manifest weight of the evidence. Appellants' argument challenging the bond order was not properly raised on appeal and is moot. We also hold that the trial court did not err when it admitted the Herman testimony. Accordingly, all of Appellants' assignments of error are overruled, and the convictions and sentences are hereby affirmed.

Donofrio, J., concurs.

DeGenaro, J., concurs in judgment only; see concurring in judgment only opinion.

DeGenaro, J., concurring in judgment only.

**{54}** I write separately because I disagree with the analysis used by the majority to resolve Appellants' fourth assignment of error. Although not specifically argued by appellate counsel, I believe that pursuant to Evid.R. 404(B) and 405(A), the trial court erred by permitting the prosecution's rebuttal witness, Mr. Herman, to testify about a prior road encounter he had with Appellants. However, because I

conclude this error was harmless, I concur with the majority's decision to affirm Appellants' convictions and sentences.

{55} The day before trial, counsel for Appellants filed a motion in limine regarding Herman's testimony about a prior road rage incident, arguing such testimony would be inadmissible pursuant to Evid.R. 404(A) and (B), specifically that this prior bad act would not be admissible under any of the subpart (B) exceptions. At trial, prior to Herman's testimony on rebuttal, counsel renewed his in limine objection on the record, arguing that although the state wished to rebut testimony that the Appellants were peaceful, he did not see "how that opens the door for him bringing in an unrelated incident that was uncharged." (Tr. Vol. II, p. 122.) The prosecutor conceded that it involved a prior road rage incident. (Id.) The trial court allowed the testimony.

{56} The issue raised in the fourth assignment of error is whether Herman's testimony was admissible to rebut the good character evidence Shuba put on about himself. The defense had offered opinion and reputation testimony to establish that Shuba is a truthful, peaceful person. I agree with the majority that Evid.R. 609, one of the rules cited by Appellants in support of their argument, does not apply here. I also agree that generally speaking, the prosecution was permitted to introduce rebuttal character testimony pursuant to Evid.R. 404(A)(1).

{57} What I find troubling is the fact that the State used an improper *method* to prove character via its rebuttal witness. Evid.R. 405(A), which applies equally to the presentation of rebuttal evidence, specifies that on direct examination, testimony regarding character is limited to opinion or reputation evidence.

{58} Here, Herman's testimony provided more than just reputation or opinion evidence, rather he testified extensively about a specific prior "bad act" of the Appellants, characterized by the prosecutor as a road rage incident.

{59} Evid.R. 404(B) provides generally that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. There are exceptions which provide that other acts evidence may be used for other purposes such as proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident, none of which apply here. It is apparent that that other acts testimony was introduced to prove Shuba's character and/or to "show action in conformity therewith."  As the majority states at paragraph 49, "Herman's testimony demonstrated that Shuba had a proclivity for aggressive, reckless and confrontational driving * * *."

{60}  In the end, although I feel it was error for the trial court to have permitted Herman's prior acts testimony, even absent this evidence it is clear beyond a reasonable doubt that the jury would have found Appellants guilty, and thus there was no apparent prejudice.  Accordingly, I concur in judgment only.